FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ OCT 0 9 2009 ★

BROOKLYN OFFICE SIFTON, J.

Gregory F. Hauser (GH-3902)
WUERSCH & GERING LLP
100 Wall Street, 21st Floor
New York, New York 10005
212-509-4717

Attorney for Plaintiffs

CV   09   4345

ORENSTEIN, M.J

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
IXOTIC AG, ERNST F. AMBROSIUS &
SOHN GEGRÜNDET 1872 GmbH, and
CHRISTIAN KRAIL,

        Plaintiffs,

    -against-

ALEXANDER G. KAMMER, DAVID S. CHENEY,
ODET QUINTANA, HELMUT TORUNO,
TEMPLETON, LTD., AMERICAN BANCSHARES
CORPORATION, ALEXANDRE MORGADO
BAPTISTA PEREIRA, ELIEZER GOMES LEITE,
MARIO SAMPO, RICARDO C. ANTA, VALTER
ALVES DE MELO and UNIVERSAL FINANCIAL
GROUP,

        Defendants.
----------------------------------------------------------------X

Jury Trial Demanded

**COMPLAINT**

      Plaintiffs IXOTIC AG, ERNST F. AMBROSIUS & SOHN GEGRÜNDET 1872 GmbH

and CHRISTIAN KRAIL  (collectively "Plaintiffs"), by their undersigned attorneys, as and for

their Complaint against Defendants ALEXANDER G. KAMMER, DAVID S. CHENEY, ODET

QUINTANA,  HELMUT TORUNO, TEMPLETON, LTD., AMERICAN BANCSHARES

CORPORATION, ALEXANDRE MORGADO BAPTISTA PEREIRA, ELIEZER GOMES

LEITE, MARIO SAMPO, RICARDO C. ANTA, VALTER ALVES DE MELO and

UNIVERSAL FINANCIAL GROUP (collectively "Defendants"), allege as follows:

## Jurisdiction and Venue

1.      This Court has original jurisdiction over this matter pursuant to 18 U.S.C. §

1964(c) and 28 U.S.C. §§ 1331 and 1367(a) in that it includes claims arising under the federal

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), and

in that all other claims are so related to the RICO claims that they form part of the same case or

controversy.

2.      Venue is proper is this district pursuant to 18 U.S.C. § 1965(a) in that each of the

defendants has either transacted his/its affairs and/or has an agent in this district, and/or pursuant

to 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to the claim occurred,

and a substantial part of the property that is the subject of the action is situated, in this district.

More specifically, millions of dollars worth of wire money transfers and other property have

been deposited into escrow in bank accounts located at a branch of JPMorgan Chase Bank in

Astoria, New York.

## Parties

3.      Plaintiff IXOTIC AG (herenafter "iXOTIC") is an *Aktien Gesellschaft* (stock

corporation) organized and existing under the laws of the Swiss Confederation with its principal

place of business in Basel.

4.      Plaintiff ERNST F. AMBROSIUS & SOHN GEGRÜNDET 1872 GmbH

(hereinafter "AMBROSIUS")  is a *Gesellschaft mit beschränkter Haftung* (limited liability

company) organized and existing under the laws of the Federal Republic of Germany with its

principal place of business in Frankfurt am Main.  AMBROSIUS is engaged in engineering,

construction and interior design, and it specializes in the design, construction and installation of

2

display structures for exhibitions, trade fairs, outdoor events, *etc.* AMBROSIUS is also a former shareholder of iXOTIC.

5.      Plaintiff Christian Krail is an individual, and a citizen and resident of the Swiss Confederation. Mr. Krail is also a shareholder and the managing director of iXOTIC.

6.      Defendant Alexander G. Kammer (hereinafter "Kammer") is an individual and a U.S. citizen residing at 4865 Hunters Way, Boca Raton, Florida  33434.  According to Nevada state records, he is the president, secretary and a director of Defendant Templeton, Ltd., and the president and a director of Defendant American Bancshares Corporation.

7.      Defendant David S. Cheney (hereinafter "Cheney") is an individual and a U.S. citizen residing at 5408 123rd Avenue East, Edgewood (Puyallup), Washington  98372.

8.      Defendant Odet Quintana (hereinafter "Quintana") is an individual and, upon information and belief, resides at 230 S.W. 63rd Ct., Miami, Florida 33144.  According to Nevada state records, he is the treasurer of both Defendants Templeton, Ltd., and American Bancshares Corporation and a vice president of the latter as well.

9.      Defendant Helmut Toruno (hereinafter "Toruno") is an individual and, upon information and belief, resides at 18965 N.W. 63rd Ct. Cir., Hialeah, Florida  33015.

10.     Defendant Templeton, Ltd. (hereinafter "Templeton"), is, according to Nevada state records, a corporation organized and existing under the laws of the State of Nevada with its principal places of business in Nevada and Florida.

11.     Defendant American Bancshares Corporation (hereinafter "ABCShares") is, according to its own website and Nevada state records, a corporation organized and existing under the laws of Nevada with its principal place of business in Florida.  ABCShares' website,

3

www.abcshares.com, lists Kammer as president and Quintana as "Vice President, Corporate Affairs".

12.    Defendant Alexandre Morgado Baptista Pereira (hereinafter "Morgado") is an individual, a citizen of Portugal and, upon information and belief, a resident of Portugal and/or the Federative Republic of Brazil.

13.    Defendant Eliezer Gomes Leite (hereinafter "Leite") is an individual and, upon information and belief, a citizen of the Federative Republic of Brazil with a residence address at 342 S.W. 1st Avenue, Dania, Florida 33004, and a business address at 1574 S.E. 3rd Court, Deerfield Beach, Florida  33441.

14.    Defendant Mario Sampo (hereinafter "Sampo") is an individual and, upon information and belief, a citizen of both the Italian Republic and the Federative Republic of Brazil, a resident of the Republic of Panama, and a principal of Defendant Universal Financial Group.

15.    Defendant Ricardo C. Anta (hereinafter "Anta") is an individual and, upon information and belief, a citizen of the Kingdom of Spain and a resident of the Republic of Panama.

16.    Defendant Valter Alves de Melo (hereinafter "Alves de Melo") is an individual and, upon information and belief, a citizen of the Federative Republic of Brazil and a resident of the Republic of Panama.

17.    Defendant Universal Financial Group (hereinafter "UF Group") is, upon information and belief, a business entity organized and existing under the laws of the Republic of Panama with its principal place of business there.

4

## Facts

### The Business Project

18.     iXOTIC is a marketing and communications agency founded to conceive and/or take on specific business projects and to develop them.

19.     Beginning in 1999, iXOTIC began working on the concept of a European "nostalgia" train.  By 2006, this had developed into a larger project involving several different luxury trains to be leased to European train operators, most or all of which would be government entities.

20.     As has become common with transportation operated by public entities, the trains would be built and owned by private entities and then leased to the train operators so that both could effectively share the tax benefits of depreciation even though the operators would be non-taxpayers.

21.     As an additional result, however, considerable capital would have to be raised to build the train cars.

22.     iXOTIC developed a budget and concluded that the project would need €130 million.

23.     iXOTIC then set about trying to find the necessary financing.

### The Game Begins:  Cheney Brings in Toruno; Toruno Brings in Kammer

24.     By the Spring of 2006, a finance contact in Vienna had recommended Cheney to iXOTIC.

25.     Cheney said he was representing Global Investments Management Corp. ("GIMC").  (Cheney also holds himself out as president of TD Link Hong Kong Ltd., which describes itself as engaged in commodities trading, revenue enhancement and project funding

5

and development; see the website at http://www.tdl-hk.com/index.shtml.  In addition, one of his

e-mail addresses suggests that he also has an association with the Seattle Development Group,

which – despite its name – has a Philippine website and claims to be in construction and

marketing; see the website at http://www.sdg.com.ph/aboutus.shtml.)

26.     According to a corporate resolution Cheney provided to iXOTIC on or about June

15, 2006, GIMC identified itself as a Puerto Rican corporation with an address of "Suite 330735·

Miami · FL · 33233".  No street address was provided, but a telephone number and telecopy

number were.

27.     iXOTIC approached a major Swiss bank about providing a loan, and the Swiss

bank indicated it would consider issuing the loan under certain conditions, including a guaranty

from a major bank holding collateral from iXOTIC.

28.     iXOTIC asked Cheney to assist with finding a bank that would issue such a

guaranty.

29.     On or about October 19, 2006, Cheney initiated contact with Toruno, whom

Cheney said he had known for about twenty years.

30.     Toruno offered to arrange for a bank guaranty against a letter of credit bearing ten

percent annual interest.

31.     Soon afterwards, Toruno stated that he was representing ABCShares, and

proposed by e-mail the following transaction:

> Here is [*sic*] the conditions of the issuance of a Bank Guarantee.  the [*sic*]
> bank issuing it will make only one phone call to the receiving bank.  There
> has to be complete understanding upon [*sic*] the receiving bank, that they
> will accept and agree to the receipt of the 130 Million Euro BG from them
> by Swift MT 760.  The verbiage will be standard with no conditions or set
> offs.  The date for maturity will be in four years.  An escrow agreement
> must be signed by the borrower and a deposit of 4% must be made with a
> release of 50,000.00 euros to complete the phone call and delivery of the

instrument.  When the instrument is delivered from the sending bank, the funds will then be released from escrow.  Please call me if you have any questions.  I will be happy to send you a draft copy of the escrow agreement.

32.     Upon iXOTIC's request, Cheney provided a telephone number for Toruno, which had a Miami area code.

33.     Further into the transaction, Toruno signed a "Sole Agent Fee Protection Agreement" on behalf of ABCShares, dated April 27, 2007, in which ABCShares agreed to pay Cheney 2.5% of the "gross profit of the transaction".  On the agreement, Cheney listed an address in Angeles City in the Philippines, which is the former Clark Air Force Base area.

34.     Toruno introduced Kammer into the transaction, as also representing ABCShares.

35.     Since Toruno and Kammer were not proposing a bank guaranty from a bank that met the standards that would enable iXOTIC to go back to the major Swiss bank for the loan, they were soon talking about facilitating the necessary financing from another source and against some other form of security.

**Kammer:  First a Failure; Now a Fraud**

36.     Kammer is a physician with a specialty in obstetrics and gynecology.

37.     According to the information available from the Florida Department of Health, Kammer attended medical school at the Technical University of Santiago, Chile, through June 1986, and his internship and residencies in the U.S.A. spanned the time from July 1988 through June 1993. He was licensed to practice medicine in Florida in 1990.

38.     Beginning in 1996, according to Florida court and other state records available on-line, there were a series of malpractice claims against Kammer.  The culmination was an incident resulting in the filing of a lawsuit in 1997 in which he was accused of, after refusing a request for a Caesarean section from a patient enduring a difficult labor, having crushed the skull

of her full-term baby during the attempted delivery.  The jury's award against him of over $5 million was affirmed by an appellate court.  *Kammer v. Hurley*, 765 So. 2d 975 (Fla. Ct. App. 4th Dist. 2000).

39.     On April 10, 2000, Kammer and Accent Women's Health Center, P.A. ("Accent"), which state records show he incorporated in 1995, filed for bankruptcy in the Southern District of Florida, petitions numbers 00-31527-SHF and 00-31526-SHF, respectively. According to the court docket, they were discharged on November 4, 2000.  Florida inactivated Accent on September 22, 2000.

40.     The records of several other jurisdictions suggest Kammer has had some difficulty maintaining a medical practice.

41.     He was licensed to practice medicine in Wisconsin in 1990, but he has not complied with CLE and other requirements, and his license there is set to expire on October 31, 2009.

42.     Kammer was licensed in Georgia in 2004 but it is unclear whether he ever practiced medicine there.

43.     In August 2005, he posted an inquiry on Wikipedia asking for help in locating a small community in the Midwest that needed a doctor.

44.     He applied for a medical license in Tennessee in 2005, but he met opposition because of his malpractice history and withdrew his application.

45.     Kammer was issued a license in Indiana in 2006, but it expired on June 30, 2009.

46.     By May 1, 2007, Kammer was practicing in Saskatchewan.  On May 10, 2008, however, according to news reports, he was fired in a controversial incident and, although in late

October 2008 he prevailed in his contest of the reasons for his dismissal, by then he had already left the area.

47.     There was apparently for a time a Facebook group named "Support Women Adversely Affected by Dr. Alexander Kammer".

48.     Kammer shows up according to state records available on-line as associated with a lengthy list of business entities in addition to Templeton and ABCShares, almost all of which besides those two are defunct.

49.     He was president of United Title Loans, Inc., incorporated on October 29, 1996, in Florida, which administratively dissolved it on October 4, 2002.

50.     On January 27, 1997, he incorporated AAA Capital Management Corporation in Nevada. Nevada shows its status as permanently revoked. There is some indication that at some point this corporation was also associated with another of which Kammer was the president, Nutri-Pro Labs Inc., which was incorporated in 2002 and the status of which Nevada has also revoked.

51.     He was involved with AAA Title Lenders U.S.A., Inc., incorporated on June 6, 1997, in Florida, which administratively dissolved it on October 1, 2004.

52.     Kammer was involved with Southern States Laboratory, Inc., incorporated on June 20, 1997, in Florida, which administratively dissolved it on September 22, 2000.

53.     He was involved with Accent Auto Repair Corporation, incorporated on April 30, 1998, in Florida, which administratively dissolved it on October 3, 2002.

54.     On March 9, 1999, he incorporated American Pathology Associates, Inc., in Florida, which canceled/administratively dissolved/revoked its status on January 14, 2009.

9

55. On September 13, 1999, he incorporated American Payday Advance Corporation in Florida, which administratively dissolved it on October 1, 2004.

56. On October 13, 1999, he incorporated Vein and Skin Spa, Inc., in Nevada, which shows its status as revoked. He filed for foreign corporation status for this corporation in Florida on January 18, 2000, but Florida revoked its active status on October 1, 2004.

57. On April 2, 2002, he formed Duomo Investments L.C. in Florida, which administratively dissolved it on September 14, 2007.

58. On July 31, 2006, he incorporated Investor Education Seminar Inc. in Nevada, which shows its status as revoked.

59. From this record, it appears that Kammer is a serial failure, a man in at least his mid-40s who has had no apparent consistent legitimate income for years.

60. Upon information and belief, Kammer's survival strategy seems to have been to use ABCShares, Templeton and other entities and collaborators to become a serial perpetrator of fraud, as the public record combined with the facts of this case and other information show.

61. According to Nevada state records, he incorporated ABCShares on October 26, 1998, and Templeton on November 15, 2004.

62. According to the complaint and affidavits filed in a lawsuit currently pending in New York State Supreme Court, New York County, *Lakeview Hotel and Resort, Inc. v. Stephen B. Schneer, Stephen B. Schneer, LLC, Alexander G. Kammer, American Bancshares Corporation and Templeton, Ltd.*, Index No. 110703/07: during 2005, the plaintiff, a Guyanese resort complex looking for expansion financing, was led by a Nigerian contact to Kammer. On October 12, 2005, the plaintiff signed a $19 million "Loan Agreement with Surety Bond" with Charmian, Ltd., a BVI corporation with a U.K. telecopy number but no street address or

10

telephone number. Kammer said that the lender insisted on Tatter Holdings Ltd., another BVI company, as the surety company, and the plaintiff then also entered into an "Agreement for Issuance of a Security Bond for Contractual Guarantee" with Tatter Holdings. The plaintiff paid the $616,500 premium to an escrow account of the defendant Schneer, a New York attorney, at JPMorgan Chase Bank. After that, Charmian made a series of complaints about lack of additional required security and noncompliance with various other clauses of the loan agreement.

63.     The complaint and affidavits detail an alleged fraud. Those loan funds never materialized. The New York attorney transferred the escrow funds to an account at Bank of America in the name of Templeton. Kammer told plaintiff that Templeton was a Tatter subsidiary. Plaintiff was able to locate and to make contact with a BVI company named Tatter, but it had never heard of Templeton. Plaintiff was also able to make contact with a BVI insurance company named Templeton, but it had never heard of Tatter and did not underwrite surety bonds outside the British Virgin Islands. Plaintiff then discovered that the Templeton to which its money had been sent was in fact a Nevada corporation headed by Kammer. Plaintiff also discovered that Charmian had been dissolved in June 2005 and has been unable to discover whether Tatter Holdings Ltd. ever existed anywhere.

64.     The plaintiff concluded in its state court complaint: "the stark reality is that this scheme is only marginally different from any standard Nigerian scam in which the mark is offered vast sums or opportunities and then asked to put up a sum, relatively small compared to the anticipated gain, in order to finalize the promised advantage. The difference . . . is that defendant Kammer used a set of quasi-legal documents, and a combination of real, defunct and never-existing corporate structures, to up the stakes in the shell game . . . ."

65.     The plaintiff's attorney says that the FBI has told him that it has a file on Kammer that includes at least one other incident but has to date declined to act. Unfortunately, that left Kammer free to up the stakes still again and to take his scheme to the next level, at the great expense of Plaintiffs here.

66.     The attorney for Lakeview described the earlier *modus operandi* very nicely. At the next level, as Plaintiffs here have discovered, the added elements have included: multiple players in different locations (including several that were only names on letters, e-mails, website pages or agreement signature lines); the use of bank accounts in the major money centers of New York City and London to lend legitimacy; extensive documentary requirements buried in the documents that led to repeated delays and mounting interest and fees; deceptive offers by those playing the role of broker to provide bridge loans, which then required additional payments as the time delays mounted; falsified statements of money transfers by others to create the illusion that their money was flowing into the transaction as well; supposed escrow arrangements that turned out to be financial black holes; strategic use of deadlines and other means to impose time pressure; the use of personal guaranties by the mark company's CEO to enhance his incentive to remain committed to the transaction even as suspicions of flimflammery began to build; and all in all a psychologically masterful performance by Defendants that succeeded in playing the Plaintiffs as well or better as the most artful angler has ever played a fish on a line.

**Fraud No. 1: the Chevalerie Transaction**

67.     On November 24, 2006, Kammer proposed to iXOTIC and Mr. Krail an agreement between ABCShares and iXOTIC as well as Mr. Krail as an individual guarantor entitled "Indicative Term Sheet". (The address and telephone and telecopy numbers for

12

ABCShares shown on the Indicative Term Sheet are the same as on its website, the URL of which was also on the agreement.)

68.     In the Term Sheet, ABCShares agreed to act as facilitator for a "Surety Backed Credit Facility" in the amount of €130 million.  The agreement provided for a 4.5% success fee to ABCShares and lender "due at time of closing and settlement" and for a due diligence fee of €53,600 "to be paid to ABC or it's [*sic*] credit analyst [*sic*] company upon acceptance of this term sheet".  (There are three other English errors in the contract; none of the five would be obvious to anyone but a sophisticated business professional who is also a native speaker of English.)

69.     Interestingly, even though no lender had been even discussed, much less identified or involved to the point where terms could be discussed with the lender, the agreement also provided that, as "enhanced security", "a lender approved surety company will issue on behalf of iXOTIC . . . to the benefit of lender a Surety/Performance Bond that will act as collateral for the loan . . . .", that the surety fee would be up to 2% of 110% of the principal loan amount, not to exceed €2.8 million, and that "[p]ersonal guarantees are also to be given at signing of the funding contract".

70.     Kammer sent the Term Sheet by e-mail addressed to Mr. Krail and his assistant, Michel Schreyer. The text of the e-mail is as follows:

Dear Messrs. Schreyer and Krail;

>     Thank you very much for the telephone call this afternoon. I hope I was clear in explaining the process for completion of your funding project. Let me go over them here.
>     1. Term sheet is signed, this basically spells out the terms and conditions of the funding, the actual processes are explained here. Please keep in mind this term sheet is on a limited time, and if there is too much of a delay interest rates do change, so it imperative [*sic*] to lock this up as soon as possible.

2. Due diligence is completed, this usually takes less than 10 days afer [*sic*] signing of term sheet.

3. If everything is verified according to the initial documents provided by yourselves, the project is then given final approval to go to the next step.

4. The escrow agreement must be signed and funded.

5. A draft copy of the loan agreement and surety bond is sent to the borrower.

6. A table top meeting is arranged with the lender for closing of the loan. Both loan agreement, promissory notes and surety agreement is [*sic*] signed.

7. The funds are released to the surety company.

8. The bond is delivered to the lender

9. The funds that were blocked and held under iXOTIC Corp name is [*sic*] then released according to the disbursement list provided by the borrower.

The above is a complete outline of the procedures.

Should you have any questions, please write to me or contact Mr. Toruno, as he is your representative.

Thank you,

Alex Kammer

71.     The "Indicative Term Sheet" as originally drafted required signature by iXOTIC and Mr. Krail by November 29, 2006, which was extended to December 4, 2006.

72.     On December 3, 2006, Mr. Krail signed for iXOTIC and for himself personally.

73.     Kammer required the due diligence fee in advance and asked that it be paid to Templeton, which he identified as his credit analysis company.

74.     Toruno provided directions that the payment be made to a bank account in New York City although Kammer had indicated that Templeton was located in Nevada for tax reasons.

14

75.     AMBROSIUS, at the time still a shareholder of iXOTIC, had agreed to loan the funds to iXOTIC necessary to effect the loan transaction.  On December 4, 2006, AMBROSIUS paid €53,600.00 to Templeton by wire transfer to its account no. 005010410465 at Bank of America, 100 West 33rd Street, New York, New York.

76.     Between then and Christmas 2006, Kammer traveled to Europe and conducted due diligence at the main offices of iXOTIC and AMBROSIUS, and at the locations of a Swiss supplier of "classic" train cars and of an Austrian company where iXOTIC was planning to have rail cars rebuilt/renovated.

77.     On January 30, 2007, Kammer sent iXOTIC a letter on ABCShares letterhead:

> We want to congratulate you on final approval of your loan request on Term Sheet dated November 24, 2006.  This letter will serve to arrange a table top meeting with the lenders [sic] representatives who will chair the meeting for final closing of all required documents prior to funding of your agreement.  The meeting will be held in Madrid, Spain or Panama City, Panama depending on the date that all parties can agree.  Here are some tentative dates that will have to be confirmed upon mutual consent: February 12th through the 16th or February 26th through March 2, 2007. Please let us know as soon as possible so we may make final arrangements and confirmation for this very important meeting.  When coming to the meetings please bring your passport and original signed shareholders agreement for funding as well as the original board resolution to accept this agreement.

78.     During iXOTIC's dealings with Kammer, he stated that he often traveled to and from Panama on business.

79.     In early February 2007, Kammer notified iXOTIC by e-mail that the meeting would be in Madrid on February 26 - March 2, 2007.

80.     In addition, he sent two draft agreements.  One was a fifteen page "Loan and Security Agreement" and the other a five page "Agreement for Issuance of a Security Bond for Contractual Guarantee" (the identical title of the agreement presented by Kammer in the

Lakeview case). Both were in English, both lacked the names of the counterparties, and he indicated that neither would be negotiable.

81.    iXOTIC responded by e-mail on February 7, 2007, asking for identification of the lender and insurer and noting that the drafts lacked specification of the payment of the surety fee and the distribution of the loan.

82.    Kammer responded the next day:

The draft contract sent to you is complete except for adding the names of the lender, borrower, surety and the Term Sheet previously issued and signed. The insurer maybe [sic] one of these three: AXA Ins. Co. Ltd; American Indemnity Group, Skandia.   We will know approximately one week before closing the insurer, and will request a letter generated from them securing the risk for iXotic AG.
The lender is Chevalerie Institutions et Regles Catholiques, they have no published economic data for security purposes. An account will be set up and blocked in favor of iXotic by them once there is a signed loan contract and surety agreement. Upon a bond being issued and delivered to the lender, they will then release this account according to the milestone. I would appreciate that you keep this information confidential and do not release this to anyone except for your legal and accounting representatives.

83.    The next day, February 9, 2007, iXOTIC sent Kammer a series of questions from its attorneys pressing for details about the lender, the potential insurers, and certain terms of the transaction not addressed in the draft agreements.

84.    On February 14, Kammer responded:

Because the lender is private and does not wish to be advertised, they do not wish to divulge their business model, nor their business proprietary information.
. . .
As far as the insured [sic] companies, this is the Lender's business, and does not wish to divulge their contacts, this has nothing to do with iXotic and is of only concern to the Lender.
The procedure of the payment will be done by instructions at the closing meeting. As far as your attorneys' [sic] are concerned they are welcome to come and see the closing, but there will not be any negotiations nor will there be any changes to the loan agreement, nor the surety agreement.

The venue will be Switzerland, or where the majority of assets of iXotic are located.

The Lender will set up an account and give iXotic their username and password to initially check their account balance and see that this has been done. Once the bond is delivered to the Lender, they will release the block on the account according to the milestones that have already been submitted by iXotic.

The Lender will give all its' [*sic*] contact information at the meeting . . . .

Closing documents are not issued prior to meeting . . . .

If you are prepared to close under these conditions we can do so, otherwise we will have to cancel on behalf of the Lender.

85.     Thus, Kammer presented the agreements in a situation that constrained the ability

of iXOTIC to do due diligence on either the lender or the insurer.

**The Madrid Meeting**

86.     The iXOTIC delegation arrived in Madrid on Sunday, February 25, 2007.

87.     Early on Monday, February 26, 2007, Kammer notified them that the meeting

with the lender and the insurer would be postponed until the next day. Later on Monday,

Kammer met with them. When questioned about how a physician was involved, Kammer

claimed to have also graduated in economics/business administration. In addition, he said that

the lender was affiliated with the Roman Catholic Church and linked to the Vatican.

88.     The next day, on Tuesday, February 27, the iXOTIC representatives went to an

address Kammer had said was the office of the lender, Paseo de la Castellana 102. (Although

there was no visible indication that it was Chevalerie's office, Kammer explained that this was

because of a very recent renovation that was not yet quite finished.) There, they met Leite,

whom Kammer introduced as the representative of American Indemnity Guarantee Ltd.

("AIGL"), which would issue the surety bond.

89.     Kammer and Leite also presented the "Agreement for Issuance of a Security Bond

for Contractual Guarantee" with AIGL as the insurer (hereinafter the "AIGL Agreement"),

already signed on behalf of AIGL. The signature is illegible; although no name or position was indicated below the signature, Kammer said that it was the signature of AIGL's President and CEO, Harrison C. Field.

90.    Leite presented a business card showing an address for AIGL at 801 Brickell Avenue, 9th Floor, Miami, Florida 33131, and, after iXOTIC pressed him, provided an e-mail address: leitee@aigsurety.com.

91.    Kammer also presented the "Loan and Security Agreement" between iXOTIC and Chevalerie Institutions et Regles Catholiques ("Chevalerie"), dated as of February 28, 2007, and bearing a seventeen digit identifying number; the last three pages, following the signature page and labeled "Addendum I", were an "Indicative Term Sheet' virtually identical to that signed by Kammer and Krail in late 2006 (hereinafter the "Chevalerie Agreement"). The main agreement had the identifying information for iXOTIC and Chevalerie filled in – Chevalerie's headquarters were shown as being in New Caledonia -- and indicated that Chevalerie would make available the amount of principal "granted in Addendum I", which was €130 million.

92.    As Kammer's e-mail of February 8, 2007, had indicated, attached to the AIGL Agreement was a letter on AIGL letterhead, signed by Basil Buelowsky, Chief Underwriting Officer, confirming the agreement between Chevalerie and iXOTIC as identified by the same seventeen digit identifying number and also that "[i]f for whatever reason our client does not satisfy the contract with you, we will refund the balance of all received funds for this premium amount within fifteen banking days of notification of failure to perform."

93.    Kammer said that Chevalerie was a conservative institution and selective in its investments, that iXOTIC was fortunate that Chevalerie had accepted the application, and that iXOTIC should quickly conclude the transaction because the proposed terms would be open for

only a short time and could be revised at any time by the lender in response to changes in the financial markets.

94.　　The iXOTIC representatives made another attempt to negotiate the terms of the Chevalerie Agreement, but the only modifications to which Kammer would agree were two handwritten amendments: (a) changing the governing law from Brazilian to Swiss per the earlier e-mail agreement with Kammer; and (b) changing the date of the last balance sheet and profit and loss statement due from iXOTIC from as of December 31,2006, to as of November 30, 2006.

95.　　On Wednesday, February 28, 2007, the iXOTIC representatives returned to Chevalerie's Madrid office. There they met Morgado, who presented a Portuguese passport as identification and whom Kammer introduced as the representative of Chevalerie and as a Catholic clergyman (Morgado was indeed in a cassock and Roman collar).

96.　　On the afternoon of February 28, Mr. Krail signed both the Chevalerie and AIGL Agreements for iXOTIC and for himself, personally, as guarantor. Morgado signed the Chevalerie Agreement for Chevalerie as its Executive Director, applying a stamp that, under a cross, identified him as "Patriarchate Archbishop". Morgado also signed the AIGL Agreement as the representative of the beneficiary.

97.　　The premium payment due under the AIGL Agreement was in excess of €2 million. On Thursday, March 1, 2007, Kammer offered to provide a bridge loan from Templeton of €500,000 to reduce the necessary borrowing by iXOTIC from AMBROSIUS; iXOTIC anticipated that it could repay Templeton from the loan proceeds.

98.　　On March 2, 2007, Kammer, for Templeton, and Mr. Krail, again, for iXOTIC and for himself personally as guarantor, signed a "Private Loan Agreement" for the €500,000, at 0.5% interest, compounded monthly, due in full on April 13, 2007, and Mr. Krail also signed a

promissory note to the same effect in Templeton's favor, again, for both iXOTIC and for himself personally as guarantor.

**The Aftermath of the Agreements with Chevalerie and AIGL**

99.     Following the Madrid meeting, iXOTIC requested additional information on Chevalerie and Morgado.  On March 13, 2007, Kammer telecopied to iXOTIC a copy of a notarized set of "Minutes of Special Meeting of the Shareholders of Chevalerie Institutions et Regles Catholiques", held in Panama City, Panama, on January 3, 2007, accepting the resignation of Victor Green Salem as Vice President and appointing Morgado to replace him.

100.     On March 17, 2007, Kammer e-mailed Messrs. Krail and Schreyer at iXOTIC:

> In reference to our telephone call yesterday, March 16, 2007, ABC has done its' [*sic*] due diligence on both AIG and Chevalerie early last year. We have come to the conclusion that these companies can and will perform as stipulated in their contracts with iXotic AG.  ABC has send [*sic*] representatives to Europe and Panama last year and was satisfied as to the resources Chevalerie has in a separate offshore institution.  AIG was seen in their offices in the USA and meetings and other documentation shown, satisfied ABC's checklist as to capabilities.  When we looked carefully at AIG, we noticed they are in fact obligated to the Lender, and the Borrower is not at any risk in case of default, so this should raise iXotic's comfort level.

101.     Meanwhile, on March 15, iXOTIC had received a letter from AIGL, dated March 12, indicating that the first half of the premium payment, €1,394,250, was due on March 16 and the second half, another €1,394,250, on March 30, 2007.

102.     In response to concerns raised by iXOTIC, AIGL apologized and issued an invoice dated March 20, 2007, requiring the two payments on March 21 and March 30, and also providing instructions that the payments be made to AIGL's account at Lloyds TSB Bank in London, "Favor of Bank of Nevis International LTD".

103.    On March 21, 2007, AMBROSIUS paid €894,250 to AIGL, to its account no. 8294416 at Lloyds TSB Bank PLC in London, also referencing the Bank of Nevis International.

104.    iXOTIC sought assurances from Kammer that Templeton was paying its agreed upon share of the premium.

105.    On March 23, 2007, Kammer telecopied to iXOTIC a copy of a "Funds Transfer Request and Authorization" from Templeton, signed by Quintana.  The document showed a Carson City, Nevada, address for Templeton but a telephone number with a Manhattan area code (646).  The document provided for payment of $685,993 from Templeton's account at Bank of America, no. 004762693292, to AIGL at Lloyds TSB Bank PLC "in favor of:  Bank of Nevis International" – the involvement of which was explained by Kammer as for tax reasons -- *via* JPMorgan Chase Bank in New York, New York.

106.    On March 29, 2007, AMBROSIUS paid a further €1,394,250 to AIGL's account no. 8294416 at Lloyds TSB Bank PLC in London, also "Favor of Bank of Nevis International LTD".

107.    At the Madrid meeting, Kammer insisted that Chevalerie receive a "General Release" from iXOTIC, waiving all potential claims against the lender (and in which iXOTIC "reaffirm[ed]" the confidentiality obligation in the Loan Agreement, which did not in fact contain any such term, and agreed to a non-disparagement clause).  iXOTIC hesitated to comply with the requirement, but, in April, iXOTIC signed and delivered the release based on, *inter alia*, Kammer's assurances that it would only be effective after Chevalerie had in fact fulfilled its obligations.

108.    On May 6, 2007, iXOTIC received by telecopy a letter from Herman Edward Friedmann, Vice-president New Accounts, Deutsche Capital Holdings, Inc., in Panama City,

Panama, notifying Mr. Krail that: "[a]n account has been opened in the name of iXotic AG . . . . This letter will confirm and [*sic*] account opening balance of One Hundred and Thirty Million Eurodollars as of April 20th, 2007. This account has a hold placed on it until we receive all the documentation checklist [*sic*] as of the same date of opening. When we receive all the documentation from our client, we will notify you as to your account username and password."

109.    Eurodollars means U.S. dollars on foreign deposit, which meant that the opening balance was considerably less than the agreed upon loan amount. When iXOTIC promptly raised this issue with Kammer, he simply indicated that Friedmann must have meant euros per the Chevalerie Agreement and that iXOTIC need not worry.

110.    There was no street address on the letterhead, but subsequently Friedmann provided an address along with a post office box and telephone and telecopy number, but also stated that "only email and fax are acceptable for any executions. We only accept fax for transfer, wires or any other executions ordered."

111.    On Monday, July 2, 2007, Kammer wrote iXOTIC on ABCShares letterhead "at Templeton Ltd's request" noting that the promissory note was overdue and that there was a late fee penalty of 5%, and making a demand for immediate payment. The letter also asked for payment of ABCShares' success fee of €6,175,000, asking for payment of all funds to the same Templeton account at Bank of America in Manhattan to which the due diligence fee had been paid.

112.    iXOTIC had, of course, been waiting for release of the loan funds, and contacted Mr. Friedmann to inquire. His e-mail address was hefriedmann@deutschecap.com.

113.    On July 18, 2007, he responded that the "glitch in your release" was that "[t]here is a clause in your contract that states Ixotic AG must not owe funds other than has been stated

22

and declared prior to signing the loan agreement.  According to our client there is an amount of five hundred thousand euros that was not reported and is not a part of the milestones submitted. In other words, the clients' legal counsel believes that the integrity of the contract has been breached by Ixotic AG and they need this to be corrected prior to any distribution."

114.    On August 16, 2007, Kammer again demanded immediate payment: "The amount due is ε [*sic*] 510,075.30.  Since we have been working so hard on iXotics' [*sic*] behalf we expect complete remuneration forthwith.  We cannot control third parties and understand your situation, but this has nothing to do with Templeton, who [*sic*] is an innocent third party that needs to be repaid."

115.    Despite further discussions, there was no other way around the problem, so, as a result, on August 23, 2007, AMBROSIUS paid €510,075.30 to Templeton's account no. 005010410465 at Bank of America in New York City.

116.    On August 31, 2007, Mr. Krail again e-mailed Friedmann asking about funding of the loan.

117.    Friedmann responded on September 3, 2007, that Chevalerie would be sending the release letter upon final clearance from their underwriters and that they expected the clearance by September 11, 2007.

118.    On September 13, 2007, Kammer notified iXOTIC that the lender required a "Transfer and Release Agreement" from iXOTIC and Mr. Krail in favor of ABCShares and Kammer, which was worded as a general release but also reaffirmed the 4.5% success fee to ABCShares and did not purport to transfer anything.  iXOTIC and Mr. Krail provided this in signed form on or about September 17, 2007.

23

119.    And then, although Kammer had since the inception of his work with iXOTIC assured Plaintiffs that he and ABCShares would assist them with the transaction until they had received all the loan proceeds, he informed iXOTIC that all subsequent communications would be with the lender's representative and that iXOTIC would receive an e-mail from that representative shortly.

**The Couturier Communications**

120.    In October 2007, iXOTIC began dealing with a Chevalerie "Trust Officer", Francois Couturier, whose e-mail address was fcouturier@chevalerierfunds.com.  On October 22, he informed iXOTIC that "[t]here are some documents that require an [*sic*] urgent attention from Ixotic and have to be redone."  He listed six documents and then "[o]nly after I receive these documents and revise them, I'll be able to determine exactly the date for releasing funds."

121.    iXOTIC then set about fulfilling the new documentary requirements as quickly as possible, an effort plagued by Couturier's requesting copies of the same documents on more than one occasion.

122.    On November 14, 2007, Kammer invoiced iXOTIC on ABCShares letterhead for a success fee of €959,429.10 based on a first draw down of the loan for €20,361,234.10, although no funds had yet been released.  He asked for payment to another Templeton account at Bank of America, no. 0049703775706.

123.    On December 14, 2007, Couturier projected "the account release for December 20" but noted that "there are some verifications we are awaiting both oral and by documentation".

124.    On December 21, 2007, Couturier notified iXOTIC that the end of the fiscal year would delay release until after January 7, 2008.

125.    Early in 2008, Couturier informed iXOTIC that Chevalerie had been contacted by Cheney about payment of his commission, which indicated that iXOTIC had shared the confidential information about the transaction with one or more third parties and had breached the agreement.

126.    Over the next several weeks, iXOTIC labored to convince Chevalerie that iXOTIC had not breached the confidentiality obligation.  By March 2008, Chevalerie accepted iXOTIC's assurances, but Couturier indicated that the accumulated delays meant that the transaction would have to be transferred to a new contract.

127.    After the request was made to AIGL to transfer the surety bond to guarantee the new loan contract, Buelowsky replied by e-mail on April 11, 2008, that the bond would be expiring on May 25, 2008, and that transfer would require paying another premium, but he reported that Chevalerie had agreed to pay two-thirds of that premium no later than April 17 so iXOTIC need only pay €879,080.

128.    iXOTIC responded with astonishment and resisted making any additional payment.  Communications through June and into July 2008 resulted in a reduction of iXOTIC's premium obligation to 25% and an agreement that it could be paid from the loan proceeds.

129.    On July 19, 2008, iXOTIC demanded the new transaction documents or threatened a demand for a refund of the surety fee as well as going to European media and "financial authorities and the Holy See."

130.    On July 21, 2008, Couturier informed iXOTIC that Chevalerie "has been sold to another fund in order to protect our customers."  On July 28, he e-mailed that there would be a new contract with Iscar Corporation and asked for twenty-five banking days.

131.   iXOTIC asked for a meeting in Zürich.  Couturier responded on August 12, 2008, that "[i]t is in the best interest of Ixotic to wait [*sic*] the conclusion of Chevalerie's own transaction."

132.   iXOTIC contacted Kammer and asked for a meeting with him in Boca Raton, Florida.  Kammer responded that personal and family health problems made a meeting impossible.

133.   On August 27, 2008, Couturier said that a meeting would be possible within two or three weeks "for sure".

134.   On September 10, 2008, iXOTIC pressed Couturier about a meeting and asked for AIGL's U.S. mailing address.

135.   On September 11, Couturier said that they were working on a meeting and that "I was informed that AIG is not in the US, nor has it ever conducted any business in the US, other than courtesy meetings."  Upon information and belief, his statement about AIGL was one of the very few accurate statements made by anyone with whom iXOTIC had been dealing.

136.   On October 22, 2008, Couturier e-mailed Mr. Krail that "[w]e are trying to make the arrangements for the meeting between the following tentative dates.  October 28[th] to 31 or November 3 to 6[th].  Unfortunately it is not up to us to choose the proper date.  We have to relay [*sic*] on the new representative's schedule."

137.   Finally, on October 28, Couturier e-mailed that "I am personally in contact with the new Company to expedite the date for our meeting.  I will have a meeting date, the new officer's name and the new Company's information, within 72 hours.  All outstanding issues have been resolved and feel 100% secure that we are now going in the right direction for a speedy conclusion."

138.    Before relating the second adventure which this e-mail introduced, however, it is worth looking at the ugly underbelly of the first adventure.

**The Chevalerie Reality**

139.    Upon information and belief, the entire transaction, from Cheney's initial representations through Couturier's e-mails, was a charade and a fraud, with no intent by any of the people or companies involved, to the extent they actually exist, to provide any financing to iXOTIC, much less any actual surety bond coverage, all designed simply to extract money from the Plaintiffs.

140.    In retrospect, what can now be seen as a significant set of odd and less than fully intelligible provisions in the transaction documents, careless errors of English and typographical errors, customary provisions that are missing, and inconsistencies among the documents, company information and communications from the Defendants, together help show the illegitimacy of their enterprise.

141.    Upon information and belief, the statements and representations detailed here and made by Cheney, Toruno, Quintana, Kammer, ABCShares, Morgado and/or Leite, either on their own or *via* communications or agreements signed by GIMC, Chevalerie, AIGL, Deutsche Capital Holdings, Field, Buelowsky, Friedmann or Couturier, including the statements and representations about:   their working towards and/or willingness to enter into and fulfill the transactions discussed; the existence, substantiality, capabilities and affiliations of the companies and others they claimed to represent and/or presented; any due diligence supposedly conducted by any Defendant concerning any entity other than Plaintiffs and iXOTIC's suppliers; the supposed payment by Templeton to AIGL; the necessity of the releases for the loan transaction to proceed; money on deposit in iXOTIC's name or being held in escrow; and the intent and

27

legitimacy of all the signed agreements, were knowingly false when made, and made with the purpose to deceive Plaintiffs and with the intent that Plaintiffs rely on those statements and representations to the financial detriment of Plaintiffs and concomitant benefit of the Defendants.

142.    Plaintiffs did in fact, in their earnestness to achieve the financing, rely on those statements and representations by Defendants to Plaintiffs' financial detriment and other injury.

143.    A key part of the Defendants' scheme was a set of corporate identities manufactured by a mix of (a) actual corporations that are in fact, upon information and belief, little more than shells, (b) websites that are, upon information and belief, a combination of plagiarism and deception, (c) alleged entities that, upon information and belief, do not in fact exist, and (d) corporate and domain names chosen, upon information and belief, for their deceptive similarity to the names of legitimate business entities that were not actually involved at all (other than their reputations' becoming indirect victims of the deception).

144.    The telephone number provided to iXOTIC by Cheney for GIMC now belongs to a flying service in Florida.  And, although the telephone number had a Florida area code (954), the telecopy area code (440) was from the Cleveland area.

145.    According to public records, GIMC appears to be an active Puerto Rican corporation, but the name "Global Investments Management Corp." is registered in Florida as a fictitious name to Faithful and Fearless L.L.C. of Ft. Lauderdale, the manager of which is listed as Padelis Dogagis.

146.    GIMC has two websites, www.gimcorp.org and http://gimctrade.com.  Both describe GIMC's mission as "to utilize a unique combination of commodities and trades, to develop suitable revenue-capital enhancement programs, to create funding needed for both GIMC's own development projects and the projects of its associates/clients".

147.    One of the GIMC websites lists Padelis Dogagis as "Director of Projects".  The other, until very recently, stated GIMC's estimated turnover for 2009 as "USD $2 billion", a patently false and ridiculous statement.

148.    The GIMC websites currently list two addresses, both different from the address on the corporate resolution provided by Cheney to IXOTIC (one in Bogota and the other in Ft. Lauderdale, again, simply a suite number without a street address), and e-mail addresses and telephone and telecopy numbers that are also different from those given on the resolution; the telephone number appears to be a Florida number but the telecopy number has the area code for Austin, Texas.

149.    Toruno responded to Cheney's communication supposedly initiating contact from an e-mail address htoruno@capitaltc.com.  The corporate resolution from GIMC provided by Cheney listed one of GIMC's e-mail addresses at the same domain.

150.    The website at www.capitaltc.com is for an entity called Capital Trust Company. The name is confusingly similar to that of Capital Trust, Inc., a major finance and investment management company based on Park Avenue in Manhattan, New York.

151.    The address listed on Capital Trust Company's website is 1562 Sawgrass Corporate Parkway, 4th Floor, Sunrise, Florida, at which is found office facilities provided by Regus, a British company specializing in providing part-time and temporary business facilities, including "virtual" offices.

152.    Nowhere on Capital Trust Company's website is even a single contact person listed by name; there is, however, one document available from the internet on the letterhead of "CTC INVESTMENT trading & FINANCING Agent" (typography per original) that shows the e-mail contact as htoruno@capitaltc.com.

153.    According to Florida state records, there is no entity by the name of Capital Trust Company organized under Florida law or registered there as an out of state entity. Nevada state records, however, show that Toruno is the president and a director of Capital Business Enterprises, Inc., incorporated in 2000, but as to which there is no evidence on the internet that it does any business and about which there is no other information available.

154.    Much of the content of Capital Trust Company's website is identical to that of and, upon information and belief, copied from the websites of other companies, such as those of NCM Funding, Inc. (www.ncmfunding.com), the U.S. Export-Import Bank (www.ex-im.com), PRN Funding LLC (www.prnfunding.com), Investment Evaluative Services (http://www.fraudreview-iesc.com/pdfs/Article3.pdf), Offshore Library (http://www.offshore-library.com/kb/articles/mutual_funds_vs_hedge_funds/), GloriaMundi.org (http://www.gloriamundi.org/picsresources/rb-ai.pdf)(a UBS Warburg research report), and Magnum Global Investments Ltd. (www.magnum.com).

155.    Toruno also shows up on the internet as the Vice President of Business Development for AML Associates, Inc., which on its website claims to be a "private lending institution" and lists three offices, all of which are Regus facilities. At least some of the content of AML Associates' website is identical to that of and, upon information and belief, was copied from other websites such as Wikipedia, riskglossary.com, and those of Tenacity Mortgage (www.tenacitymortgage.com) and KSI Capital Corp. (www.ksicapital.com).

156.    In retrospect, the unorthodox "only one phone call' proposal made by Toruno was the earliest indicator that Defendants would use control over the structure of the transaction components, including timing and escrow arrangements, to perpetrate their scheme.

157.    The street address given for ABCShares at its website is 2255 Glades Road, Boca Raton, Florida, which is another Regus facility.

158.    ABCShares' website claims that it "specializes in commercial finance solutions for transactions ranging from $1,000,000 to $1,000,000,000." There follows an extensive website providing lengthy explanations of a great variety of loan and related transactions.

159.    In fact, much of the content of ABCShares' website is identical to that of Capital Trust Company and, upon information and belief, likewise copied from the other websites as previously alleged, making the collaboration between Toruno and Kammer apparent.

160.    If this were not enough, in the course of seeking to convince Chevalerie that iXOTIC had not breached its confidentiality obligations, it sought assurances from Toruno that he had not disclosed any confidential information about the transaction. He responded by telecopied letter in which he indicated that he worked for ABCShares as an independent contractor and that he had done "a few job [sic] for ABC like Due diligence for a three [sic] clients and a few other things."

161.    Interestingly, Toruno had his signature on the telecopied letter notarized by Nilda Arana, who shows up in public records as one of the incorporators of American Reliant Funding, Inc., in 2003 in Florida. The other two incorporators were Scarlet Toruno and Rebecca Toruno. Florida administratively dissolved the corporation the next year for failure to file an annual report.

162.    Buelowsky's letter on AIGL letterhead attached to the AIGL Agreement listed an address of 801 Brickell Avenue, 9th Floor, Miami, which is another Regus site location.

163.    AIGL has a website, www.aigsurety.com. At the bottom of each page, the site states "Wholly owned division of American International Group, Inc.".

164.     A division is, of course, not a separate entity and so cannot be "wholly owned", a descriptor applied to subsidiaries.  There is in fact an actual AIG Surety entity that is part of the legitimate mega-insurer American International Group, Inc., but that group has no subsidiary or division by the name of American Indemnity Guarantee.

165.     Upon information and belief, the claim on AIGL's website of affiliation with the American International Group, Inc., is false and that claim along with the use of the aigsurety.com domain name are both intended to deceive others into believing that AIGL is a legitimate insurance entity with an affiliation it does not in fact possess.

166.     Under "About Us", AIGL claims headquarters in Vanuatu and branches in Buenos Aires, Hong Kong, Bangalore and Nevis St. Kitts, but under "Locations" lists four addresses: Vanuatu; Bangalore; Santiago; and Tokyo, all but the first of which are Regus locations.  There is presently no mention of Miami on either page, although there had been at the time that iXOTIC first started dealing with AIGL.

167.     Many of the names of individuals listed on the AIGL "Organization" page (almost all of which are suspiciously imaginative or are the names of American and British historical figures), including the President/CEO, also show up on the internet associated with a company called "American Restoration", which has an address of 801 Brickell Bay Drive, Miami, the address of a suites hotel, and is a company about which no indication it actually engages in business or any other information is available.

168.     The only mention of Harrison C. Field on the internet is as President and CEO of AIGL and, upon information and belief, he does not exist.

169.     The AIGL "Organization" page lists Basil Buelowsky as Chief Underwriting Officer, and has a heading "U.S. Office" but lists neither the physical location for Mr.

Buelowsky nor an address or any other contact information other than an e-mail address for the U.S. office. Other than his mention on the AIGL website, at least according to the internet, Mr. Buelowsky does not seem to exist.

170. There was and is no mention of Leite on the AIGL website.

171. Leite filed for personal bankruptcy along with another, presumably his wife, on January 22, 1998, in the U.S. Bankruptcy Court for the Southern District of Florida, Petition No. 98-30279-SHF. According to the court docket, the final decree was entered on May 14, 1998.

172. In October 2002, Leite incorporated Dissurance Limited, Corp. in Florida, which was voluntarily dissolved in October 2007.

173. On April 30, 2004, the Isle of Man Financial Supervision Commission issued a warning that it had "recently become aware of the activities of [Dissurance Limited Insurance Company], which claims to have a presence in or connection with the Isle of Man." The Commission warned that no such entity existed there, had ever been authorized to conduct the insurance business there, or had any "genuine links" with the Isle of Man, and that "the Commission would strongly urge persons considering dealing with this entity to exercise the greatest possible caution before proceeding . . . ."

174. In October 2007, Leite incorporated CBE Capital Business Enterprises, Inc., a name that nicely matches the name of Toruno's Nevada corporation with the addition of the corporation's initials as the first part of the name, and a corporation which remains active and shows Leite as the only officer and director.

175. Earlier in 2007, however, Leite was accused by Brazilian authorities of participation in a gang of almost two dozen who allegedly perpetrated a series of commercial frauds that netted the gang in excess of four million reais (~$2.14 million). Leite was named as

one member of a gang headed by Wittembergue Magno Ribeiro and his four brothers. The frauds allegedly involved, *inter alia*, shell and fictitious corporations, falsified documents, and a "virtual bank" used to offer one victim a loan of five million reais (~$2.67 million) only to abscond with R$300,000 in contractual fees (~$160,000).

176.   Upon information and belief, Kammer chose the name Templeton because of its confusing similarity to the names of other insurance companies from elsewhere in the world and there are other victims of this deception.

177.   On or about December 12, 2005, the Isle of Man Financial Supervision Commission issued a warning concerning "Templeton Ltd. Surety Company":

> The Commission has become aware of documents received by persons in Brazil and claiming to originate from the above. Within the documents, which purport to be an "Agreement for issuance of a security bond for contractual guarantee" [the same title as for both the AIGL Agreement and the Lakeview-Tatter agreement] there are also references to Templeton Insurance Limited showing an Isle of Man address.
> There are genuine companies incorporated on the Isle of Man by the name of Templeton Limited and Templeton Insurance Limited.
> Enquiries carried out by the Commission have established that the aforementioned documents did not originate from, nor were they issued with the consent or knowledge of the genuine Templeton Limited or Templeton Insurance Limited. . . .
> The genuine Templeton Insurance Limited does underwrite surety business emanating predominantly from the UK and Europe, however it has not underwritten or reinsured any surety business in Brazil. . . .
> The genuine Templeton Limited . . . is used by the genuine Templeton Insurance Limited as an insurance broker . . . . The genuine Templeton Limited has stated to the Commission that it is not and never has been a conduit for the genuine Templeton Insurance Limited to write surety business or financial guarantees.
> Under the circumstances, the Commission would strongly urge persons who have been presented with documents matching the above description and containing references to Templeton Insurance Limited and/or Templeton Limited, to exercise the greatest possible caution, bearing in mind the contents of this public notice.

178.    The enforcement division of the Manx Financial Supervision Commission advises that the Templeton and Dissurance warnings both resulted from contacts initiated by attorneys for Brazilian victims of the frauds.  Another link between the two was that a Thomas Fritzlander with a New York City address was the primary registrant both for a domain name used in the Dissurance case and for two other domain names used in the Templeton case.

179.    The Manx FSC enforcement division also advises that the genuine Manx Templeton, after its own review of many of the documents provided by the victim's attorney, provided a list of people and other entities involved.  That list included Alexander Kammer and Eli Leite of American Bancshares Corporation, at the same address as listed on its website, and Charmian, Ltd., the purported lender in the state court lawsuit pending against Kammer and others in New York.  Also involved in the transaction was a Templeton account at JPMorgan Chase in New York City, no. 693 615 109 466.

180.    It is at this point worth noting that, according to Nevada state records, on September 20, 2006, Kammer incorporated there a corporation named "American Identity Guaranty Co.".  To what extent he may have used the confusing similarity of this name with others in execution of wrongdoing is as yet unknown.

181.    Upon information and belief, key to Defendants' scheme was their realization early on that Plaintiffs lacked the sophistication, experience and linguistic abilities to engage in the focused, line by line and even word by word scrutiny of lengthy, legalistic agreements in the English language that would commonly occur in transactions of the size at issue.

182.    The AIGL Agreement appeared legitimate to the iXOTIC representatives.  On close examination, however:  (a) it contains no dates; and (b) it is riddled with mistakes of English -- even entire sentences that make no sense -- suggesting that it is a combination of a cut

and paste job of boiler plate borrowed from other documents and efforts by non-lawyers to sound like lawyers, perhaps by an attempted translation of legalese from another language such as Spanish or Portuguese.

183.    As examples (all that follow except ellipses are exactly as in original):

"The Security Bond shall be issued upon an Emission Request . . . .";

"In case the **BORROWER** or its representative(s), had made any false or inaccurate statements, or hidden any pertinent material of fact that may manipulate the information to induce the issuance of the Surety . . . .";

"**ISSUER** reserves the right not to comply with the terms of the bond when breaches occur resulting from one or more of the following conditions:  1.  Fortuitous cases or Force Major Acts.";

"any interest or amounts owed to the **ISSUER** by reason of the issued Security Bond and that it was not cancelled by the **BORROWER** and it's collateral guarantee and before a formal notice or complaint . . . .";

"When the **BORROWER** and/or its issuer's and cosigners . . . becomes insolvent . . . .";

"The **ISSUER** rights shall prevail, initiating judicial and/or extra judicial motions, request estoppels, special or general forbiddances and any other preventive measures deemed necessary by which the **BORROWER** and/or its collateral guarantors or cosigners agree upon.";

"the **BORROWER** affirms that it will not request from the **ISSUER** any defacement of the debt payment . . . .";

"The **BORROWER'S** collateral issuer's and cosigners affirm that they . . . .";

"It will not be responsible for damages, losses, interests or additional expenses occurred

to the **BENEFICIARY** . . . .";

"If the **ISSUER** remains in compliance with its' obligations . . . ."; and

"The **ISSUER** reserves the right to execute any changes of it's **UNDERWRITING**

**POLICY** . . . ."

184.    The AIGL Agreement has an unusual emphasis on fulfillment of obligations by

the borrower, namely, iXOTIC, especially with regard to providing information and documents,

and penalties for any failure in this regard, for the most part forfeiture of all premiums paid

and/or additional liability. The AIGL Agreement also has an atypical clause requiring that all the

transaction documents be kept confidential.

185.    The Chevalerie Agreement was better written, which is not surprising since it

turns out to be, upon information and belief, heavily copied from a document available on the

internet, a model Loan and Security Agreement for a loan to a California company from a site

that provides sample business contracts:

http://contracts.onecle.com/3do/iig.loan.2003.03.19.shtml.

186.    The use of this model by non-lawyers unused to documents intended for

transaction-specific marking up, however, led to some incongruity. For example, the "Venue"

clause in the Chevalerie Agreement ended up reading as follows (bold-faced in original):

"Any suit, action or proceeding arising hereunder . . . shall, if **Lender** so elects, be instituted in

any court sitting in the Sovereign [*sic*] Country of Switzerland, in the chosen city in which the

**Lender's** attorneys recommend or if none, any court sitting in a State (the "Acceptable

Forums")."

187.   Also, although this was a loan by a New Caledonian company to a Swiss company providing for preferential jurisdiction for any suit in Switzerland, *i.e.*, with no connection to any jurisdiction with civil jury trials, there is a lengthy jury trial waiver clause.  In addition, although there was no transactional connection with Brazil, Brazilian law was to govern the agreement.

188.   This last fact suggests another connection with the Dissurance and Templeton deception warned against by the government of the Isle of Man, both of which involved victims in Brazil.

189.   Modifications to the model contract from the internet site included stripping out most definitions and terms pertaining to actual payments and other obligations by the lender as well as the specific repayment terms and adding terms providing for the surety bond, the personal guarantee of Mr. Krail, and imposing detailed documentary and other obligations on iXOTIC.  The material added by the Chevalerie scrivener(s) is obvious since the new paragraphs are lettered; the material from the model is numbered much like the original.

190.   The details in the two agreements that would lead an experienced native English speaking attorney or sophisticated business person quickly to question their *bona fides* were not, however, obvious to iXOTIC's representatives, none of whom had been involved with a transaction anywhere near this large and none of whom was fluent in English, much less English commercial legalese.  On their faces, the two agreements passed as legitimate.

191.   Nobody at iXOTIC caught another now apparent inconsistency.  Although Morgado signed the Chevalerie Agreement as Executive Director, the subsequently provided corporate resolution named him Vice President.

192.    In September 2008, iXOTIC sent representatives to Madrid, Florida, Vanuatu and New Caledonia to investigate what had become an alarming situation and soon became more alarming.

193.    In Madrid, they discovered that what Kammer had said was an office of Chevalerie was simply a location that rented temporary office space.

194.    In Florida, Kammer again pleaded personal health problems and refused to meet with them and, by e-mail, denied any responsibility for the problems with Chevalerie and claimed that the only funds he received were for legitimate due diligence services rendered.

195.    Upon information and belief, in particular the refusal and apparent inability of Templeton/Kammer to produce confirmation of actual payment to AIGL, Templeton did not in fact make any payment to AIGL, and the bridge loan transaction into which Kammer induced Plaintiffs was a ruse to cause them to "repay" Templeton/Kammer the €500,000 (plus interest, *etc.*) even though it had never actually been loaned in the first place.

196.    When iXOTIC's representatives visited the Miami address of AIGL, 801 Brickell Avenue, Suite 900, they were told at first that nothing was known of AIGL. After they became insistent, Regus's Operations Manager, Ms. Aixa Trujillo, informed them that AIGL had been only a short term tenant and its lease had expired about six months before. She then refused to provide any further information without a court order.

197.    In Vanuatu, they were told by someone admitting to be the former administrator there for AIGL that AIGL had been a registered, authorized insurance company in Vanuatu in 2006 and then, in 2007, had applied to become a broker instead, but AIGL had failed to meet the documentary and fee requirements either to become a broker or to continue as an insurance company and its authorization had expired on December 31, 2007.

198.   Upon information and belief, AIGL is at most a shell entity that does not in fact provide any insurance services but is used by Kammer and other of the Defendants as the lead device to induce up front payments from Plaintiffs and other victims allegedly to secure a larger transaction that the Defendants in fact intend will never take place.

199.   In New Caledonia, the iXOTIC representatives discovered that Chevalerie's post office box belonged to another company entirely, a company whose personnel claimed never to have heard of Chevalerie.  The iXOTIC representatives then checked in New Caledonia with the chamber of commerce, with the commercial court that handles corporate registrations, and with the Institut de la Statistique, an organization claiming to have the most comprehensive database of economic and commercial data for New Caledonia.  In none of them was there any current or past trace of Chevalerie.

200.   Chevalerie's name was in fact, upon information and belief, a shortened version of Chevalerie d'Institutions et Règles Catholiques d'Union Indépendante et Traditionaliste (CIRCUIT), which, according to various reports, was for a time in 1956 the official registered name of an organization also known as the Priory of Sion, whose short-lived existence that year ultimately became the basis for a manufactured, mythical history of what has been termed one of the great hoaxes of the twentieth century, a myth drawn on as one of the bases for the larger fiction by the name of "The DaVinci Code".

201.   Internet information indicates that Chevalerie's domain chevalerierfunds.com was created on September 12, 2007, only a matter of days before Kammer notified iXOTIC that it would thenceforth be dealing directly with a representative of Chevalerie.

202.    Although, until sometime recently, the domain chevalerierfunds.com was registered to Chevalerier (not Chevalerie) c/o Francois A. Couturier at the same post office box given in the Chevalerie Argeement, it is currently a "parked" domain.

203.    Morgado may be a Catholic priest, and informal information has indicated that he once carried a Vatican passport, but he is not an archbishop, as can be seen from the website that keeps meticulous track of the hierarchy of the Roman Catholic Church: http://www.catholic-hierarchy.org/.

204.    In this connection, "Patriarchate Archbishop" is a title used only in the Slavic, Near Eastern and Middle Eastern Orthodox and Eastern Rite Catholic Churches and for which a Portuguese cleric is a highly unlikely candidate in any event. Furthermore, the cross stamped above Morgado's signature on the Chevalerie Agreement is not a Patriarchal Cross but an Order of Christ Cross, historically a symbol associated with Portugal.

205.    In fact, according to news reports, Morgado is a criminal, prosecuted for a human trafficking crime involving the attempted 1991 smuggling of a group of Brazilians to the United States. From news reports, he apparently told a group of over forty Brazilians that he would arrange passage to the United States on a cruise ship including private rooms for each in return for $5,000 per person. When they arrived to board, the vessel turned out instead to be a fishing boat with a capacity of twenty-two. The badly overloaded boat was intercepted at sea. He was arrested in Brazil in 2001, imprisoned, convicted and sentenced to eleven years but apparently released early.

206.    Informal information indicates that the Vatican had acted more quickly than Brazil and revoked his passport in 1991.

207. Morgado is also, from information on the internet, involved with a fictitious nation called the Dominion of Melchizedek, which claims to be a sovereign, independent, ecclesiastical entity on part of Antarctica and on a number of small Pacific Islands that in fact have long belonged to actual nations, but in reality it is nothing more than a platform for significant bank fraud.

208. Finally, Morgado has at least one connection with Florida. In 1997, he incorporated the Portuguese Press Institute, Inc., there as a non-profit corporation. Florida dissolved the corporation the next year for failure to file an annual report.

209. iXOTIC has, despite repeated requests to Kammer, never received any confirmation that the payment by Templeton to AIGL was in fact effected.

210. After iXOTIC came to the conclusion that the document Kammer initially supplied on March 23, 2007, a Funds Transfer Request dated March 21, 2007, for $685,993, did not even show that it had in fact been sent to the bank much less prove that the transfer had taken place, iXOTIC pressed Kammer again for proof of the payment.

211. In response, on October 9, 2008, Kammer sent still another Funds Transfer Request, this time dated April 18, 2007, for $684,500, to entirely different account numbers in London.

212. The address supplied for Deutsche Capital Holdings in Panama is simply a business center, and its supposed website, www.deutschecap.com, is also currently a "parked" domain. Internet information indicates that it was previously registered to Charmian, Ltd., again, the purported lender in the alleged Lakeview fraud and one of the entities involved in the Templeton case investigated by the Manx FSC.

213.    iXOTIC never received an explanation of how, if loan proceeds had been already paid into escrow at Deutsche Capital Holdings, Chevalerie's subsequent transaction issues somehow meant that no funds were available.

214.    According to corporate filings of public record, Deutsche Bank has a number of affiliates with names that begin with "Deutsche Capital", including Deutsche Capital Holdings Pty. Limited in Australia, but none named Deutsche Capital Holdings Inc.

215.    The e-mails from Friedmann, an e-mail from Buelowsky and at least some of the e-mails from Kammer during the second half of 2007 and the first half of 2008 all originated from the same server in Saskatchewan, where Kammer was practicing medicine at the time.

216.    Upon information and belief, none of Chevalerie, Deutsche Capital Holdings, Inc., Basil Buelowsky, Herman Edward Friedmann or Francois Couturier actually exists and all of them were invented by Kammer and/or Morgado and/or other of the Defendants to deceive Plaintiffs.

217.    The claim in early 2008 that Cheney had contacted Chevalerie about his commission was a now obvious falsification merely for the purpose of delay since Chevalerie never existed, although he may well have contacted other of the Defendants about his cut in the proceeds of the scheme.

218.    Upon information and belief, Couturier was an identity created by Kammer and/or others to play Plaintiffs along until they could be put into Sampo's more experienced hands for an even larger hit, intending to play on the investment Plaintiffs had already made and their revealed susceptibility.

219.    AMBROSIUS made total payments of €2,852,175.30 to AIGL and Templeton in connection with the AIGL and Chevalerie "Agreements".

43

**Fraud No. 2:  the Winthrop Transaction**

220.    Within the seventy-two hours promised by Couturier on October 28, 2008,

iXOTIC received an e-mail from twbadmin@tweiselbrokers.com that read:  "Please find

attached a letter with information of your interest."

221.    Attached was a letter on the letterhead of Thomas Weisel Brokers (hereinafter

"TWB"), listing its offices as "UNITED STATES  CANADA  BRITISH VIRGIN ISLANDS

PANAMA"  but giving no street address, telephone or telecopy number, or any other contact or

identifying information.  The letter, signed by a Dominic Bradley (whose position at TWB was

never indicated), read in pertinent part as follows:

> Due to a financial restructure [*sic*], starting last October 17[th], our
> institution has acquired part of the CHEVALERIE's active agreements.
> During the mentioned acquisition, we were told that an agreement signed
> on February 2007 [*sic*] with iXotic continues in open status.  We are
> interested in proceeding with the financial transaction initially agreed with
> Chevalerie.  In order to expedite the closing, our offices in Panama were
> assigned as the agents to provide the new agreement that will replace the
> one signed by Chevalerie.  A meeting between iXotic's principal and our
> representatives is required in order for both our companies to analyze
> more closely the new commitment to be signed.  We will arrange to meet
> iXotic, during the third week of November in our offices in Panama.
> Please let us know, as soon as possible, if the meeting date is comfortable
> for you.

222.    iXOTIC's attempt to reach the website www.tweiselbrokers.com resulted in their

reaching www.tweisel.com, the website of Thomas Weisel Partners (hereinafter "TWP"), a

legitimate investment bank based in San Francisco (a spin-off from the former Montgomery

Securities), with offices in several cities in the U.S.A., Canada and Europe.  The pages of TWP's

website display the same triple "swoosh" logo that was at the top of Mr. Bradley's letter.

223.    iXOTIC was leery of proceeding, but the legitimacy of Thomas Weisel Partners

combined with the suggestion of the new contacts in Panama that the approximately €2.8 million

paid to AIGL could be salvaged for the new transaction, a major incentive, convinced them to go forward with the meeting.

224.    In addition, in reliance on the Chevalerie Agreement, iXOTIC had already signed a number of contracts with suppliers for the train project and was facing liability in the millions of euros.

225.    Bradley indicated by e-mail that Mario Sampo was the leader of the Panama City office.

226.    In early November, a P. D'Vandeul at Thomas Weisel Brokers (position unidentified) provided assistance by e-mail with the hotel reservations in Panama City for the iXOTIC delegation.

227.    In mid-November, iXOTIC's representatives, including Mr. Krail, arrived in Panama City.  They met there with Sampo, who presented his business card from Universal Financial Group, at the offices of which in Avenida Federico Boyd, Torre Universal-Mezanine, Panama City, Panama, they were meeting.

228.    Also at the meeting were Alves de Melo and Anta, whom Sampo introduced as being from Thomas Weisel Brokers.  Anta presented a Thomas Weisel Brokers business card, with the same triple "swoosh" logo, showing an address of 390 Park Avenue in New York City, which is where Thomas Weisel Partners has its Manhattan office.  (The phone numbers, however, had an area code of 206, which is from Seattle, and the card also showed a "Bank line 228/21 – Nassau Bahamas".)

229.    Sampo already had all the documents from the Chevalerie transaction.  He and his colleagues indicated that they and the UF Group were affiliated with Thomas Weisel and that they represented a number of investors, from Canada and elsewhere, interested in providing the

financing desired by iXOTIC and who would be acting through a Bahamian company affiliated with Thomas Weisel, and presented a proposed term sheet.

230.     Sampo and company told the iXOTIC representatives that some of the terms were negotiable and others -- such as an interest rate of eight percent if the loan would be made in dollars and ten percent if in euros -- were not.

231.     The two groups then proceeded to negotiate and to effect the transaction which, all in all, took about two months in Panama City. The negotiations and other dealings were conducted for the most part in Spanish and Portuguese, although all the transaction documents were in English.

232.     After each round of negotiations, Sampo and company told the iXOTIC representatives that the results and the documents had to be sent to Thomas Weisel in the United States for approval or other reaction, for which the iXOTIC representatives then had to sit in Panama City and wait.

233.     Among the terms would be that the loan would be secured by a key man insurance policy on Mr. Krail and also that iXOTIC would place its share certificates in escrow.

234.     In connection with the first of these, Mr. Krail was sent by Sampo to a medical examination by Dr. Abelardo E. Saldaña, a family medicine specialist, at the Family Care Medical Clinic in Panama City, and for blood tests at a medical testing laboratory. The insurance was to be provided by Interoceánica de Seguros, webpage at: http://www.interoceanica.com/english/direccion.html.

235.     To fulfill the other security guaranty, on December 3, 2008, Mr. Krail instructed that the share certificates for iXOTIC be delivered to him at the Hotel El Panamá in Panama City. He delivered them to Anta at the TWB offices in Panama City on December 6 or 7, 2008,

to be held in escrow at the account of International Escrow Systems Inc. a/k/a I.E.S. Inc. at JPMorgan Chase Bank in New York City.

236.    Sampo and his colleagues gave instructions that the initial payment towards the key man insurance premium also be paid into escrow for a period of thirty days, also into the I.E.S. Inc. account at JPMorgan Chase Bank in New York City, in order to provide temporary coverage as a condition for the release of the loan funds, at which time the coverage would become permanent.

237.    On December 8, 2008, AMBROSIUS paid $132,701.50 into I.E.S. Inc.'s JPMorgan Chase Bank account in New York City, no. 693 502 969 265.

238.    By early December, Sampo and company presented iXOTIC's representatives with a fully drafted "Credit Facility Agreement" for $165 million with Winthrop Investments Limited, a Bahamian corporation (hereinafter "Winthrop"), signed on its behalf by a Ronald Eduard Norman (hereinafter the "Winthrop Agreement"), described in the recitals as "its manager authorized for this act" but with his post otherwise unstated. The loan was to be paid out in tranches and repaid in eighteen semiannual payments, beginning one year from the release of the first tranche with interest at 8.25%, although the first year's interest of $13,612,500 would be added to the principal amount of the loan.

239.    The contract appeared legitimate and business like. A significant portion of the Winthrop Agreement concerned the security, guarantee and documentary obligations of iXOTIC and Mr. Krail, not surprising for a loan of this size.

240.    On or about December 14, 2008, Mr. Krail signed the Winthrop Agreement both on behalf of iXOTIC and on his own individual behalf as guarantor.

241.    The Winthrop Agreement required as a condition for closing the production by iXOTIC and Mr. Krail of a significant body of documentation (all in triplicate, an original with Mr. Krail's notarized signature on every page plus two notarized copies of the original), which they set about assembling.  The contract provided that the determination whether the documents complied with the requirements would be made within a week of filing and that the first tranche would be paid out within seven business days from certification of documentary compliance, but also imposed a ten day time limit from signature for filing of the required documents.

242.    Mr. Krail and some of the iXOTIC delegation remained in Panama City.  The distance and the approaching holidays delayed assembling the required documents, and then Winthrop gave them notice of a minor discrepancy involving the iXOTIC board resolution, which required still more time to rectify.

243.    On December 30, 2008, Mr. Krail and the other iXOTIC representatives received a letter from a Lic. Juan Echeverría purporting to be from the legal department of TWB (no address given) notifying them that they had missed the deadline but also pointing out that the contract allowed iXOTIC to purchase an extension of up to thirty days by making a payment of the interest due on the loan principal for the time period of the extension, up to a maximum of $850,781.25 for the maximum extension of thirty days.

244.    On December 30, 2008, AMBROSIUS arranged for payment of $483,645.90 into the designated account of I.E.S. Inc., also at JPMorgan Chase Bank in New York City, a different account with the number 693 615 842 165, which payment was effected as of January 2, 2009, and which Plaintiffs understood extended the deadline to January 13, 2009.

48

245.    When it did not appear that iXOTIC would meet that extended deadline either, on January 12, 2009, AMBROSIUS paid another $368,671.87 into the same account to acquire the full thirty day extension.

246.    That second extension payment was made before iXOTIC received a copy of a letter dated January 9, 2009, from a John Brommer at Prince International Survey Associates Inc. (no address or other contact information given) addressed to Winthrop, certifying that there had been compliance with the Winthrop Agreement's documentation requirements for iXOTIC.

247.    Finally, on January 21, Sampo and company presented the iXOTIC representatives with a printed-out two page "Closing Position". The document confirmed the satisfaction of the documentation requirements under the Winthrop Agreement but showed unpaid contractual expenses and fees of $7,342,400, amounting to 4.427% of the loan principal, laid out in Appendix IV as "Spread: 0.852% - Registration: 1.15% - Clearstream: 0.23% - Issuance: 0.35% - Administration: 1.20% - Transaction: 0.125% - Legal/Accounting: 0.52%".

248.    Mr. Krail nonetheless signed the Closing Position based on explicit oral statements by Sampo that the fees could be paid from the initial loan proceeds.

249.    Mr. Krail and the iXOTIC representatives then returned to Europe.

**Post-Panama:  Payments Into Perpetuity**

250.    On January 27, 2009, Bradley of TWB notified iXOTIC by e-mail that funding of the loan awaited iXOTIC's covering those fees.

251.    iXOTIC protested that they were to be paid from the initial working capital portion of the loan, as Sampo had assured iXOTIC's representatives.

252.    TWB did not relent and insisted that the fees be paid up front.

253.    This was beyond the capabilities of iXOTIC and AMBROSIUS.

254.    Sampo offered to help by arranging for coverage of some of the fees through recovery of some of the money previously paid to AIGL.

255.    After supposedly being in contact and negotiating with AIGL, Sampo had Mr. Krail sign, on February 13, 2009, an "Approval of Recovery Value from AIG" in the amount of $3,133,744 less expenses of $109,681.04 for a net of $3,024,062.96.

256.    On February 18, Bradley of TWB confirmed by e-mail that this net amount from AIGL had been credited to the I.E.S. Inc. account.

257.    That left a balance of the contractual fees and expenses due of $4,318,337.04, an amount confirmed on February 26 by e-mail from a P. Terence at TWB (position unidentified).

258.    Sampo then proposed that this balance be covered by a separate bridge loan, and he brought into the picture an American company by the name of Eurofunds International LLC (hereinafter "Eurofunds"), based in Arlington, Virginia, which offered to provide a loan in the amount of $4,415,000, the net proceeds from which (after expenses) would be paid over to cover the remaining balance due for the contractual fees and expenses for the Winthrop Agreement (the "First Bridge Loan").

259.    Sampo also agreed to a side agreement between iXOTIC and TWB guaranteeing the closing of the main loan upon full coverage of the remaining balance of the contractual fees and expenses, which was prepared by iXOTIC.

260.    On March 19, 2009, Sampo sent to iXOTIC a Credit Agreement between Eurofunds and iXOTIC, signed for Eurofunds by a Raald Duart Laman, whose position at Eurofunds was not stated, for $4,415,000 at 10.25% interest, which required deposit of a collateral guaranty in the amount of fifteen percent of the loan amount and repayment in twelve

50

monthly payments of $367,916.67 beginning thirty days after release of the loaned funds, which would be reduced by expenses of $94,370.63 to a net loan of $4,320,629.37.

261.    On March 20, 2009, Sampo signed the side agreement between TWB, "main offices:  Nassau, Bahamas" and iXOTIC.  The side agreement included a provision requiring TWB to provide to iXOTIC a copy of Winthrop's certificate of incorporation within forty-eight hours of the release of the funds for the First Bridge Loan.

262.    Also on March 20, 2009, both of these two new agreements were signed on behalf of iXOTIC along with twelve promissory notes for the installment repayments and two funds transfer requests authorizing Eurofunds to pay itself the $94,370.63 in expenses and the net loan proceeds of $4,320,629.37 to the I.E.S. Inc. account at JPMorgan Chase in New York City.

263.    On March 23, 2009, AMBROSIUS paid $662,250 as the required collateral guaranty to Eurofunds' account, also at JPMorgan Chase Bank in New York City, no. 693 615 791 266.

264.    At the beginning of April 2009, iXOTIC inquired about the failure of any of the main loan proceeds yet to be available.

265.    Bradley, in an e-mail response on April 7, 2009, although he had earlier confirmed actual receipt of the full $3,024,062.96 from AIGL, claimed a discrepancy in the amount available from AIGL, namely, that its "ledger" showed only $2,754,792 available, which left $378,952 still owed.

266.    It took the remainder of April to settle the AIGL matter, including the drafting and signing of a General Release in favor of AIGL by iXOTIC and Mr. Krail, dated April 30, 2009, which was sent to iXOTIC on or about April 30, signed by Buelowsky and was then countersigned by Mr. Krail.

267. To try to protect itself, iXOTIC had also sought another side agreement between iXOTIC and TWB providing closing assurances, this time also personally guaranteed by Sampo, and Sampo agreed.

268. This second side agreement was signed on or about April 30, 2009, by Sampo for both TWB and himself, and was then countersigned on behalf of iXOTIC and by Mr. Krail as an individual guarantor of the payment of the remaining $378,952.

269. This side agreement included a provision requiring that TWB provide within seven days a great deal of documentation to iXOTIC, including account balance statements of all the escrow accounts at JPMorgan Chase, the signatories for all those accounts, commercial register extracts for TWB USA, TWB Panama and TWB Bahamas, the business address and contact data of Eurofunds, and the key man insurance policy documentation and number.

270. On May 5, 2009, AMBROSIUS paid the $378,952 into the I.E.S. Inc. account at JPMorgan Chase Bank in New York City, no. 693 615 842 165.

271. On May 25, TWB informed iXOTIC by e-mail that its bank in Switzerland had been sent a SWIFT communication from Panama on May 22 and provided the SWIFT transmission details.

272. iXOTIC's Swiss bank, in response to iXOTIC's inquiry, said that it was unaware of any such communication. iXOTIC so notified TWB. TWB then on May 27 provided SWIFT transmission details again, which this time, however, were slightly different. iXOTIC contacted its Swiss bank again but, in response to this second inquiry by iXOTIC, its Swiss bank said that it would not comment on any SWIFT communication unless it involved an actual receipt of funds.

273.    TWB subsequently provided to iXOTIC by e-mail a copy of the supposed SWIFT transmission, which said: "WE, BANCO NACIONAL DE PANAMA . . . HEREBY CONFIRM, WITH FULL BANK RESPONSIBILITY AND LIABILITY BY INSTRUCTIONS OF WINTHROP INVESTMENTS, INC. THE CLOSING OF THE TRANSACTION C.F.A. NUMBER 03255-1028 BENEFICIARY IXOTIC AG . . . CONDITIONED TO [sic] PAYMENT OF COUPONS PN 029/0309-1 AND PN 028 0309-2".

274.    This last was a reference to the fact that the first two payments due under the First Bridge Loan had come due.  On May 25, Bradley informed Mr. Krail that, based on the SWIFT communication, those had to be covered before the main loan could close.

275.    On May 27, 2009, AMBROSIUS paid $813,728.99 to Eurofunds' account at JPMorgan Chase Bank in New York City, no. 693 615 791 266, to cover those two payments.

276.    On June 12, 2009, iXOTIC's attorney reminded Sampo of the overdue obligations to provide a copy of Winthrop's certificate of registration and to make the initial payments from the Winthrop loan to iXOTIC's suppliers.

277.    That same day, Bradley of TWB e-mailed Mr. Krail that that the first release of the main loan funds would be granted within "48 banking hours" and that the release information would be sent to iXOTIC's bank on June 16, 2009.

278.    On June 16, 2009, came an e-mail from a Mike Bernard at TWB, whose position there was unstated, detailing $52,712,391.26 in loan payments to iXOTIC and its suppliers – the first tranche -- that had been authorized, conditioned, however, on "immediate coverage of the value due on [sic] Clause 28", namely, $3,998,671.88.

279.    Bernard claimed to be with TWB in New York and provided iXOTIC with a number from the 212 area code, stating that it was his "personal and direct telephone number", at

which "[y]ou can reach me during office hours . . . from 9:00 AM until 5:00 PM eastern time" and at which number Mr. Schreyer has spoken with him on more than one occasion.

280.    iXOTIC replied the next day protesting that nothing more could be due, pointing out that the two side agreements between TWB and iXOTIC specifically said nothing more would be due before closing.

281.    TWB, however, was taking the positions that all the delays up to that date were the responsibility of iXOTIC and that Clause 28 required payment of approximately ninety-nine days of interest on the full loan principal.

282.    iXOTIC's attorney sent an e-mail echoing the insistence that nothing more was due.

283.    On June 18, Bernard e-mailed back that TWB's loan committee had met and, based on the side agreement of April 30, had reduced the liability to $2,807,578.17, but the interest until that date would still have to be covered.

284.    iXOTIC protested and again disputed that there was any additional liability.

285.    Sampo pressed for payment of the interest and suggested payment into a different I.E.S. account than had been used to date, no. 693 615 791 255, at JPMorgan Chase Bank in New York.  On the Escrow Account Application he provided in connection with the proposed payment of $2,808,700.43 (the interest liability plus $1122.26 in legal, insurance and administration fees), the beneficiary shown was "Winthrop Investment [*sic*] Ltd.", and the beneficiary's authorization was to be signed by Ronald Eduard Noman, supposedly bearing a U.S. Passport, no. 035916339.

286.    On June 24, Bernard in a telephone conversation with Mr. Schreyer and by e-mail to Sampo, which he forwarded to iXOTIC, said that he would keep the contract open for no longer than forty-eight hours.

287.    iXOTIC continued to resist any further liability.

288.    Meanwhile, the third payment due under the First Bridge Loan was also coming due.

289.    Ultimately, with the threat of TWB in New York hanging over the transaction, Sampo proposed and managed to convince Plaintiffs to enter into a second bridge loan transaction along the same lines as the first, except that the total amount would be $3,219,567 (the "Second Bridge Loan"), and iXOTIC secured the concession that there would be a third side agreement with TWB that would be guaranteed by "T. Weisel Partners Inc." (hereinafter "TWPI") in New York and signed by Mike Bernard.

290.    On or about June 29, iXOTIC received the second Eurofunds Credit Agreement, again signed by Laman, and the third side agreement with TWB, signed by Sampo with a signature line prepared for TWPI by Mike Bernard, and they were countersigned on behalf of iXOTIC and returned.

291.    Also on June 29, 2009, AMBROSIUS paid $1,228,000 as the required collateral guarantee for the Second Bridge Loan into Eurofunds' JPMorgan Chase Bank account in New York City, no. 693 615 791 266.

292.    From the Second Bridge Loan, $2,800,700.43 was allocated to the interest liability and $418,866.57 to payment of the promissory note under the First Bridge Loan with interest.

293.    On June 30, 2009, iXOTIC received an updated closing position for the Winthrop Agreement, dated June 29, 2009, and showing "SITUATION: Clear."

294.    Also on June 30, iXOTIC received a copy of the third side agreement with TWB signed by Mike Bernard for TWPI and a letter from Noman at Winthrop acknowledging "our accordance" with the side agreement.

295.    On the same day, iXOTIC received a statement, dated June 30, 2009, showing balances in two different accounts of I.E.S. Inc. at JPMorgan Chase Bank in New York City: $132,236.70 for the key man insurance policy; and $7,340,171.53 for the contractual fees and expenses.

296.    Not long after, iXOTIC finally received a notarized Certificate of Good Standing for Winthrop, dated June 30, 2009, from the Commonwealth of the Bahamas, although TWB never provided a copy of the Certificate of Incorporation.

297.    On July 3, 2009, iXOTIC received a telecopied communication from a Justin E. Bagdad at Eurofunds' Credit Department (no other indication of his specific position was stated), from a telecopy number with a New York City area code (646), confirming receipt of the collateral guarantee payment.

298.    On July 10, 2009, iXOTIC received confirmation from Eurofunds that the obligations under the First Bridge Loan were "properly updated" and sending back cancelled the first three promissory notes.

299.    On July 9, 2009, however, iXOTIC had received an e-mail from Bradley enclosing an escrow statement from I.E.S. Inc. showing that, on July 7, $18,892,400 had been deposited into one escrow account and $146,107,600 into another but noting "a [*sic*] open debit

related to the updating of the credit line from 06/25/09 until 07/07/08 [*sic*] in a total of $340,312.56. This issue must be resolved in order for us to start the releasing process."

300. iXOTIC resisted paying any more until it actually received the loan funds.

301. Bernard insisted on July 13, 2009. that "since the contract is out for clearing, a passive interest has to be applied for those days prior to the funding of the escrow accounts".

302. Under a renewed threat that the loan proceeds would be held in escrow for only a limited time, on July 14, 2009, AMBROSIUS paid $340,312.56 into the I.E.S. Inc. account at JPMorgan Chase Bank in New York City, no. 693 615 842 165.

303. On July 15, 2009, Bradley claimed that the funds had gone to the wrong escrow account and that it would take forty-eight hours to redirect the funds.

304. On July 17, 2009, iXOTIC emailed TWB expressing astonishment that neither Sampo nor Bernard could be reached by telephone and asking for evidence of the first transfers scheduled under the loan.

305. On July 20, 2009, an R. Morales at TWB (his position was unstated) replied "we would like to inform that today were [*sic*] requested to our administration the position in regards to the iXotic releases. We expect to have the exact situation and the planned schedule at the end of the day or later tomorrow, then will keep you informed."

306. On July 21, 2009, Bagdad at Eurofunds requested payment of the next installment for repayment of the First Bridge Loan, $367,916.67, which had been due the day before, on July 20, 2009.

307. On July 22, 2009, iXOTIC sent an e-mail requiring confirmation of payment of the first funds releases under the loan and, if not received, threatening to turn the matter over to its attorneys.

308.    On July 25, 2009, iXOTIC received an e-mail supposedly originating from TWB's Legal Department and otherwise unsigned saying that "[i]n order to answer your request properly we have contacted our administrative department for the right orientation in this matter" but also that the payment due Eurofunds on July 20 would have to be made before the transaction could proceed.

309.    On July 26, 2009, iXOTIC again protested that there had been an oral modification to the agreements and that the amount was therefore not due until July 30th. and that release of the main loan funds was overdue, and requested a meeting in New York the following week between iXOTIC's attorneys and TWB's "empowered representative".

310.    There came on July 28, 2009, an e-mail response from a Fred E. Peterson purporting to be from TWB's Legal Department that any meeting would have to be with "the agents in charge of your contract, in their local offices" and that "[i]n addition, we would like to confirm, that your creditor informed today the period that was granted to keep the iXotic's debt unpaid according to a Promissory Note in arrears, will expire.  They also notify that if the mentioned debt remains uncovered after tomorrow (July 28, 2009) they will claim an immediately [*sic*] return of the available funds as per clause 8th of the credit agreement signed and recognized by your company."

311.    Under this threat, on July 28, 2009, AMBROSIUS paid $367,916.67 to Eurofunds' account no. 693 615 791 266 at JPMorgan Chase Bank in New York City.

312.    A meeting was set up in Panama City for July 30 but then cancelled, and, on August 4, 2009, Bagdad of Eurofunds requested payment of the next promissory note payment due.

313.    There was discussion of a meeting in August 10, 2009, but it was not confirmed, and on that day Bradley requested that the payment to Eurofunds be made before the loan transaction could proceed.

314.    On August 12, 2009, iXOTIC took the position that Winthrop, TWB and TWPI had gone into default on their obligations and that iXOTIC would pay Eurofunds only upon release of the main loan proceeds to iXOTIC and/or its suppliers.

315.    Bradley responded that, since the next promissory note was not due until August 31, 2009, prompt payment of the amount due Eurofunds from July 31 would allow time for the main loan transaction to close.

316.    iXOTIC responded by again requesting that the main loan proceeds first be released.

317.    Between then and late September 2009, the parties' positions did not materially change beyond a suggestion by Sampo that iXOTIC's representatives should come to Panama to meet and to try to find a solution.

318.    On September 18, 2009, Peterson of TWB's Legal Department e-mailed iXOTIC that "we interceded with your creditor in order avoid [*sic*] the contractual cancellation and adjust new credit agreements on the bases of quarterly repayments to postpone the payment of the due balances of both credit agreements." Attached was a letter signed by Bagdad at Eurofunds setting up new terms with quarterly repayments due at end of the last month of the quarter but "[a]s a main condition to get the issuance of new contracts, iXotic will have to cover the amount of unpaid interest due until September 20, 2009 whose total is $171,343.41 . . . [and] the new contracts . . . must be signed and guaranteed by Mr. Krail." The letter also said that iXOTIC would have to pay fees and expenses of $192,889.38.

319.   Despite repeated requests from iXOTIC, other than supposed statements of the balances in the escrow accounts, TWB has declined to provide the rest of the documentation required by the side agreements, including a failure to provide an actual street address, or telephone or telecopy numbers, or e-mail address, or any other contact information for either I.E.S. Inc. or Eurofunds.

320.   Indeed, Sampo has orally repudiated the three side agreements on the claimed ground that they were never formally integrated with the Winthrop Agreement.

**The Winthrop Reality**

321.   Internet diagnostics show that the e-mail from Couturier on October 22, 2008, mentioning the possible timing of a meeting with the replacement lender for Chevalerie came from a computer in Panama City, Panama.

322.   Upon information and belief, by this time, Kammer had handed over the Couturier identity to Sampo, and the e-mails from Couturier were nothing more than a means to continue and to expand on the Chevalerie/AIGL fraud.

323.   Based on the information detailed herein, it is now Plaintiffs' firm belief that Sampo, Alves de Melo, Anta, the UF Group, P. D'Vandeul (actually Patrick de Vandeul), Bernard and, to the extent that they may actually exist, TWB, Winthrop, I.E.S. Inc., Eurofunds, TWPI and the other people whose names appear on their documents and the e-mails from TWB and UF Group, had no purpose, intent or design other than to bilk the Plaintiffs.

324.   Upon information and belief, the entire Winthrop transaction, including the dealings with TWB, I.E.S. Inc., Eurofunds and TWPI, from Bradley's initial letter to iXOTIC through now, was and continues to be a charade and a fraud, with no intent by any of the people or companies involved, to the extent they actually exist, to provide any financing to iXOTIC,

much less any actual escrow services, key man insurance, bridge loans, or any other services, all designed simply to extract as much money from the Plaintiffs as possible.

325.    In retrospect, as with the Chevalerie fraud, what can now be seen as a significant set of odd and less than fully intelligible provisions in the transaction documents, careless errors of English and typographical errors, customary provisions that are missing, and inconsistencies among the documents, company information and communications from the Defendants, together help show the illegitimacy of their enterprise.

326.    Upon information and belief, the statements and representations detailed here and made by Sampo, Alves de Melo, Anta, Bernard and/or the UF Group, either on their own or *via* communications or agreements signed by TWB, Winthrop, I.E.S., Inc., Eurofunds, TWPI, Banco Nacional de Panama, Norman/Noman, Bradley, Echeverría, Brommer, Terence, Morales, Peterson, Laman, or Bagdad, including: the statements and representations about their working towards and/or willingness to enter into and fulfill the transactions discussed, the existence, substantiality, capabilities and affiliations of the companies and others they claimed to represent and/or presented, any due diligence supposedly conducted by any Defendant concerning any entity other than Plaintiffs and iXOTIC's suppliers, the necessity of any release for the transaction to proceed, and the intent and legitimacy of all the signed agreements; the confirmations of money transfers other than those by AMBROSIUS; and the bank and escrow account statements and other statements or representations about money on deposit in the name or to be at the disposal of iXOTIC or about money or other property being held in escrow, were knowingly false when made, and made with the purpose to deceive Plaintiffs and with the intent that Plaintiffs rely on those statements and representations to the financial detriment of Plaintiffs and concomitant benefit of the Defendants.

327.    Plaintiffs did in fact, in their earnestness to achieve the financing, rely on those statements and representations by Defendants to Plaintiffs' financial detriment and other injury.

328.    Their earnestness was fuel for a machine run by experienced crooks.

329.    According to news reports and reports of legal proceedings, Sampo and at least two of his friends have been pursued for multi-million dollar frauds before and Sampo has been involved in more than two dozen civil and criminal proceedings in Panama.

330.    According to those reports:  Sampo is Italian-Brazilian and arrived in Panama in 2000.  In 2003 Sampo was involved in a fraud in which he and several associates, including Patrick de Vandeul and Alves de Melo, promoted financial services over the internet using the name of Tempus Bank.  Several people deposited money there, up to the hundreds of thousands of dollars each, but, when they went to withdraw it, encountered nothing but objections about why they could not.  It turned out that, despite claims by Sampo *et al.* that the bank was based in Montenegro and/or Latvia, it did not legally exist anywhere.  Tempus set up several front companies in Panama, including Universal Financial Group, Inc., all of which are on a "warning" list of entities not authorized to engage in the banking business in Panama posted by the Panamanian Superintendency of Banks:  http://www.superbancos.gob.pa/advertencia/list.asp (as well as on a list of entities with licenses revoked by the Seychelles Islands).  A couple of years later, Sampo was accused of swindling a Panamanian businessman of $16 million and, in January 2006, he was arrested.

331.    According to public records, Sampo had a Florida driver's license that expired in 2004 and has had, at least in the past, an address there:  10205 Collins Avenue #501, Miami Beach, Florida  33154.

332. Also according to Florida records, Sampo, like other of the Defendants, was involved in the incorporation of several Florida corporations that are now inactive: First Union International Finance Corp. (incorporated in 1998; inactive since 2000); Conex Travel Corp. (incorporated in 1999; inactive since 2000); Colombine Corporation (incorporated in 1999; inactive since 2000); and Listotec Import Export S.A., Inc. (incorporated in 1999; inactive since 2000).

333. One of the other officers/directors of Conex Travel Corp. is listed as Wittenberg M. Rebeiro, who is, upon information and belief, the same Wittembergue Magno Rebeiro who was head of the accused criminal gang arrested in 2007 in Brazil that also included Leite.

334. Upon information and belief, there is no such entity as Thomas Weisel Brokers and the name is no more than a deceptive d/b/a for the UF Group and/or Sampo and colleagues.

335. The e-mails signed by either Sampo or the UF Group have all come from the tweiselbrokers.com domain.

336. Internet diagnostic shows that the e-mails from P. D'Vandeul and P. Terence, and most of the e-mails from Sampo, Bradley, Peterson and the UF Group have all come from the same computer in Panama City, Panama, as have some of the e-mails from Bernard, even though he was supposed to have been in New York City.

337. Some of the e-mails from Sampo, Bradley and Peterson have come from a second computer, some of the e-mails from Sampo and Bernard have come from a third computer, and one of the e-mails from Bradley came from a fourth computer; all these computers are in Panama City, Panama.

338. The internet domain tweiselbrokers.com was at the time iXOTIC began dealing with TWB registered to TWB at 390 Park Avenue in Manhattan – the actual New York City

address of Thomas Weisel Partners – with the contact person listed as Teresa Weisel. That
domain today is registered with Domains by Proxy, a service designed to enable domain
registrants to hide their identity. The link to the website of TWP no longer functions.

339.    According to its website, the legitimate investment bank of Thomas Weisel
Partners has no offices in any of Panama, the British Virgin Islands or the Bahamas. According
to information from TWP's legal department in San Francisco, it has never had offices in any of
those locations, it has no affiliate by the name of, and has not done business under the name of,
Thomas Weisel Brokers, has had nothing to do with the domain tweiselbrokers.com, has never
heard of any of Teresa Weisel, Dominic Bradley, Mario Sampo, Ricardo Anta, Valter Alves de
Melo, P. D'Vandeul, P. Terence, R. Morales, Mike Bernard or Fred E. Peterson, and has
certainly never authorized any of them to claim any connection with TWP.

340.    Upon information and belief, Dominic Bradley does not even exist, nor does any
of Juan Echeverría, P. Terence, R. Morales or Fred E. Peterson, or, at the very least, they are not
legitimately employees or agents of TWB, since it does not exist.

341.    Winthrop may or may not exist. The only information available on line from the
Bahamas is whether the company name is available; "Winthrop" is not. There was once a
company by the name of Winthrop Investments Limited in Australia, but it was merged into
another company in or about 1984.

342. ·   Winthrop's address listed on the Credit Facility Agreement is the address for the
Bahamas office of a Panamanian law firm.

343.    The "Certificate of Good Standing" for Winthrop, dated June 30, 2009, and
presented to iXOTIC is almost certainly a fraud. It bears the notarized signature of Oswald E.
Freeman as Acting Registrar General. The website of the Bahamian government lists the Acting

64

Registrar General as Ms. Jacinda Butler, and other internet information indicates that she has been in that post since at least 2008 and continues in that position. There is no internet indication that an Oswald E. Freeman exists anywhere, much less has had any position with the Bahamian government. The notary on the document, Willian Rennan McKulyns, is not on the list of registered notaries available at the website of the Bahamian government, nor is there any internet indication that he exists anywhere.

344. The Winthrop Agreement is riddled with errors and incongruities. In its first paragraph, it states that Winthrop is represented by "Mr. RONALD EDUARD NOMAN", but the several signature lines, on the main Agreement and the three appendices, were all prepared for "Ronald Eduard Norman." Although the lender is Winthrop, recited as a Bahamian corporation, the seals applied to each of the several signature pages are for "Thomas Weisel Brokers United Kingdom"; the TWB letterhead listed no office in the United Kingdom.

345. The Prince International Survey Associates Inc. letter memorandum is addressed to Mr. Ronald E. Noman at Winthrop. There is no internet indication that either Prince International Survey Associates Inc., Noman – perhaps intended to read that way, indicating "no man" -- or Norman exists and, upon information and belief, none of them does exist.

346. The Winthrop Agreement has a number of clauses headed "Sole Paragraph", a term that has no legal meaning in English but appears to be a translation of a Spanish legal term, *único*.

347. Although supposedly prepared in the United States for a Bahamian corporation, two English speaking jurisdictions, the Winthrop Agreement reads in many places as if it had been translated from Spanish. There are many errors and other oddities in the Agreement's language. As examples:

"The **LENDER** does hereby grant the **BORROWER** a financial loan . . . from a clear and clean funding source . . . .";

"the **BORROWER** does hereby bind itself to repay the **LENDER**, on an unconditional, irrefutable and unrestrictive basis . . . .";

"In the assumption of the incidence of the borrowing rate provided for in Clause 28, the value shall be paid off upon the request for a term extension submitted by the **BORROWER**, pro rata the period agreed upon.";

"Through the representative and per se, the **GUARANTOR** do hereby expressly . . . .";

"The **GUARANTOR** does hereby . . . .  [following sentences, still referring to the Guarantor:]  They also . . . .They further . . . .";

"Likewise, it is hereby acknowledged that the transaction governed hereby does not propose any kind of change in the terms hereby agreed upon . . . .";

"A detailed breakdown of the guarantee offered as substituting . . . .";

"Consequently, in case a legal action is filed to collect overdue and unpaid amounts, the **LENDER** shall not be obligated to prove that the overdue obligations in arrears are those expressed in the complaint, the amounts declared by the **LENDER** being taken as correct, liquid, and enforceable, which shall be of good faith, turn the action into a summary proceeding, and cause all relevant effects.";

"The parties further agree that . . . does not imply the remission, innovation, pardon, waiver or alteration of the terms agreed upon."; and

[this is the entire sentence] "Any other cause not within the control of such party or which is by exercise of reasonable diligence, the party will be unable to foresee or prevent or remedy."

348.    The Credit Agreements between iXOTIC and Eurofunds for the First and Second Bridge Loans each recite that Eurofunds International LLC is "incorporated and organized under the sovereign laws of the United States, main offices in Arlington, Virginia, registered under ID No.:27-0088314", an identification that any American attorney or one sophisticated in such matters would recognize is bogus but which appeared perfectly plausible to Europeans not fluent in English and inexperienced in such matters.

349.    The Credit Agreements also each state: "This agreement shall be construed and governed exclusivity [*sic*] in accordance with the Laws of the United States of America, and subject to the jurisdiction of the Court of New York City, in order to adjust any conflicts or disagreements, without exception, being privileged over any other court." (The three side agreements between TWB and iXOTIC have an almost identical clause, which iXOTIC simply copied from the Credit Agreements, although the three side agreements at least used the grammatically correct "exclusively".)

350.    These clauses are ones that any attorney licensed in any state in the U.S.A. would recognize as ineffectual, but that recognition requires more knowledge of the details of the legal and judicial systems of the U.S.A. than the Plaintiffs had.

351.    Those same side agreements between TWB and iXOTIC identified TWB as having its main office in the Bahamas even though its letterhead listed no such office and the website of TWP, of course, also shows no such office.

352.    In addition, the idea that an individual executive of a broker such as Sampo would personally guarantee the obligations of the broker and one of the principals to the main transaction is specious.

353. Interestingly, the escrow account statement received by iXOTIC on June 30, 2009, showed a file date of June 30, 2009 and transactions through late March 2009, but also that it was printed on January 21, 2009.

354. Upon information and belief, neither International Escrow Systems Inc. a/k/a/ I.E.S. Inc. nor Eurofunds International LLC exists and those names were chosen and used because there are companies active in the United States by the name of International Escrow Services Inc. and Eurofunds International Inc., the latter based in Maryland, not in Virginia; neither of them, however, has any connection to any of the parties or transactions that are the subject of this action.

355. While the JPMorgan Chase Bank accounts for I.E.S. Inc. and Eurofunds are in New York City, those accounts were apparently opened at an outer borough branch in the Queens neighborhood of Astoria, which is not where entities engaged in legitimate major, sophisticated international financial transactions would be expected to do their banking, but the distinction between Astoria and Manhattan was lost on the Plaintiffs. Interestingly, internet information indicates that the telecopy number from which communications from Eurofunds originated is located in this same part of the New York City Borough of Queens.

356. The General Release of AIGL by iXOTIC was signed by Basel Buelowsky, and his signature was notarized by a New York notary, even though they had been dealing with Basil Buelowsky in Miami. Upon information and belief, there is also no Basel or Basil Buelowsky in existence.

357. Buelowsky's signature purports to be notarized by Donald J. Hartnet, but the notary stamp does not, as is customary, identify the county in which the notary public is qualified in New York, and the New York State Secretary of State's listing of qualified notaries public

does not include a Donald J. Hartnet. There is no internet indication that a Donald J. Hartnet exists, which is unusual for a notary public, and, upon information and belief, he does not exist.

358.    Mike Bernard's New York telephone number was not even the same exchange as for TWP's New York City office in East Midtown Manhattan. Bernard's number is an unlisted number; the available information indicates that it is a landline located in West Midtown Manhattan. And, as already noted, all the e-mails from Bernard came from a computer address in Panama City, Panama.

359.    The signatures of Noman/Norman at Winthrop and Laman at Eurofunds are consistent, indeed, identical to the point that they do not appear to have been applied by human hands. The different communications from Bagdad at Eurofunds, however, do not appear consistent in their signatures. In addition, the July 3, 2009, confirmation from Bagdad at Eurofunds, a single page form, showed his name in one place as Bagdad and in another as Bagdag; one does not customarily sign a document in which his own name is misspelled, as supposedly have Messrs. Bagdad and Norman/Noman. Upon information and belief, as with Norman/Noman, neither Laman nor Bagdad exists.

**The Damages**

360.    Payments by AMBROSIUS in connection with the Winthrop and related transactions totaled $4,776,179.49.

361.    Between the two parts of the Defendants' fraudulent scheme, the payments to the Defendants by AMBROSIUS (at current exchange rates) total $8,975,722.40.

362.    iXOTIC is indebted to AMBROSIUS for that amount.

363.    In addition, in connection with the two sets of transactions, iXOTIC and AMBROSIUS incurred and paid travel, personnel, interest and other direct costs of over one

million dollars, and keeping iXOTIC afloat while waiting for the financing that never materialized has cost Plaintiffs in excess of another one million dollars.

364.    iXOTIC has outstanding invoices from suppliers for orders placed in anticipation that the Chevalerie and/or Winthrop financings would come through totaling almost six million euros.

365.    iXOTIC is now insolvent and effectively out of business.

366.    AMBROSIUS is unable, and will never be able, to collect any of the debt from iXOTIC.

367.    Mr. Krail has lost his employment, sustained serious damage to his career, lost his entire investment in iXOTIC, and is theoretically exposed to millions of dollars of liability pursuant to the agreements detailed heretofore in which he guaranteed the obligations and liabilities of iXOTIC.

368.    Upon information – including:  the neatly orchestrated hand-off chain from Cheney to Toruno to ABCShares and Kammer to Templeton to Morgado and Leite to Sampo, UF Group, Anta and Alves de Melo; the explicit fee sharing arrangements among them; the knowledge of Sampo and colleagues in Panama of the Chevalerie and AIGL transactions and the use by Sampo of the funds supposedly in AIGL's hands for the Winthrop transaction; the web of connections among Defendants through corporations, websites, domain names, and in Florida, Panama and Brazil; and the common, recurring patterns in their wrongdoings – and belief, all the Defendants were knowingly engaged in a single, extensive conspiracy and have shared among themselves the approximately $9 million in payments by AMBROSIUS on behalf of iXOTIC.

**The Current Standoff**

369.   On September 22, iXOTIC on behalf of itself, Mr. Krail and AMBROSIUS notified the Defendants, Bernard, and, as best as iXOTIC could, AIGL, Chevalerie, TWB, TWPI, Eurofunds and I.E.S. Inc. that they were in material breach of their agreements with iXOTIC and Krail, that there had been material misrepresentations from the beginning justifying rescission of all the agreements, and that iXOTIC and AMBROSIUS demanded return of all payments made and iXOTIC's share certificates within forty-eight hours.

370.   Defendants have not returned either any money or any of the iXOTIC share certificates.

371.   One or more of the Defendants remains in possession or control of iXOTIC's share certificates.

372.   Kammer has in response to iXOTIC's demand not only denied any wrongdoing or any knowledge of the others' wrongdoing but had the nerve to invoke the release in favor of him and ABCShares and to remind iXOTIC of its liability to them for the success fee.

373.   Sampo has insisted that rescission requires an in-person meeting in Panama and that he refuses to provide draft rescission documents before the meeting because of bad experiences with such situations in the past.


### First Claim:  Civil RICO -- Conduct of an Enterprise

374.   Upon information and belief, as heretofore detailed, the Defendants, each of them and jointly, have voluntarily, intentionally, knowingly and willfully devised, conducted and participated in a scheme to defraud the Plaintiffs out of money by false pretenses.

375.   Upon information and belief, they did so with the intent to defraud.

376.    It was reasonably foreseeable in so doing that interstate/international wire communications would be used to further Defendants' scheme.

377.    Interstate/international wire communications were in fact used to further the scheme.

378.    On more than one occasion, one or more of Defendants wrongfully transmitted in foreign commerce, with intent to extort money, a threat to injure the property of Plaintiffs, namely, to cause the forfeiture of the opportunity for financing sought by iXOTIC and/or funds held in escrow at JPMorgan Chase in New York City and/or implicitly to trigger the personal liability of Mr. Krail, and, as a result of Plaintiffs' reasonable fear of economic loss, obtained money from Plaintiffs as a result of that threat.

379.    Upon information and belief, Defendants thus committed multiple, related acts of wire fraud and/or extortion, all with the same purpose and same victims, namely, Plaintiffs, that amounted to continued unlawful, criminal activity over a substantial amount of time that is also a continuing threat to others.

380.    Upon information and belief, Defendants' scheme to defraud Plaintiffs constituted for Defendants a regular way of doing business.

381.    Their scheme thus constituted a pattern of racketeering activity.

382.    Upon information and belief, the Defendants thus acting together in an association in fact constituted an enterprise.

383.    The activity of the Defendants' enterprise affected interstate and foreign commerce.

384.    By virtue of the foregoing, Plaintiffs were injured in their business and their property.

72

385.     As a result of the foregoing and pursuant to 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for threefold their damages and the cost of this suit, including a reasonable attorney's fee.

## Second Claim:  Civil RICO -- Conspiracy

386.     Plaintiffs here adopt by reference all preceding allegations.

387.     Upon information and belief, each Defendant agreed to join the conspiracy to defraud Plaintiffs, agreed to act together including the commission of multiple acts of wire fraud and/or extortion, and knew that those acts were part of a pattern of racketeering activity.

388.     As a result of the foregoing and pursuant to 18 U.S.C. § 1962(d), Defendants are liable to Plaintiffs for threefold their damages and the cost of this suit, including a reasonable attorney's fee.

## Third Claim:  Fraud in the Inducement and Rescission

389.     Plaintiffs here adopt by reference all preceding allegations.

390.     Upon information and belief, as heretofore detailed, Defendants misrepresented material facts to Plaintiffs, including but not limited to:  the existence, legitimacy, capabilities, substantiality and affiliations of the businesses Defendants represented or presented and even the existence of many of the supposed individuals involved; Defendants' intent to facilitate or to provide the financing and insurance sought by Plaintiffs; the facts of the money transfers by all the entities other than AMBROSIUS; any due diligence supposedly conducted by any Defendant concerning any entity other than Plaintiffs; the necessity of releases for transactions to proceed;

the intent, effect and legitimacy of the written agreements presented to Plaintiffs; the balances in escrow and other bank accounts; *etc.*

391.    Upon information and belief, all those misrepresentations were false when made.

392.    Upon information and belief, each of the Defendants knew the falsity of all misrepresentations.

393.    Upon information and belief, each of the Defendants made his false representations with the intention of inducing iXOTIC and Mr. Krail to enter the various agreements heretofore described and other reliance by Plaintiffs, including, of course, the payments made by AMBROSIUS and the delivery to Defendants of iXOTIC's share certificates.

394.    Plaintiffs detrimentally relied on those misrepresentations.

395.    As of result of all this, Plaintiffs have sustained the monetary and other damages heretofore detailed.

396.    As a further result, all the agreements and releases are by law invalid and void *ab initio*, and Plaintiffs are entitled to a judgment rescinding all the agreements and releases and requiring return to them of all their payments and other property delivered to Defendants and payment by Defendants to Plaintiffs of their additional damages.

397.    Upon information and belief, Defendants conspired together to commit this fraudulent inducement.

398.    As a result, Defendants are jointly and severally liable to Plaintiffs.

399.    Upon information and belief, the fraud committed by Defendants, and by each of them, was gross, wanton, willful and morally culpable.

400.    As a result, Plaintiffs are entitled to punitive damages.

## Fourth Claim: Conversion

401.    Plaintiffs here adopt by reference all preceding allegations.

402.    Defendants' acceptance of payments by AMBROSIUS and the share certificates of iXOTIC was therefore without legitimate authorization.

403.    Defendants have exercised dominion and control over those funds and share certificates to the exclusion of Plaintiffs' rights to that property.

404.    Defendants have refused to return the property despite due demand by Plaintiffs.

405.    As a result, Plaintiffs are entitled to the return of that property, payment to them by Defendants of their additional damages, and punitive damages.

WHEREFORE, Plaintiffs demand judgment:

(a) on the first and/or second claims, awarding Plaintiffs threefold their damages, plus interest as allowed by law, and the cost of this suit, including a reasonable attorney's fee;

(b) on the third claim, rescinding all the agreements and releases between any one or more of the Plaintiffs and any one or more of the Defendants or Chevalerie, AIGL, TWB, TWPI, I.E.S. Inc, Eurofunds or Winthrop, ordering the return by Defendants of all payments of money by AMBROSIUS and of the iXOTIC share certificates delivered to Defendants, and awarding Plaintiffs their additional damages, plus interest as allowed by law, and punitive damages;

(c) on the fourth claim, ordering the return of all payments of money by AMBROSIUS and of the iXOTIC share certificates delivered to Defendants, and awarding Plaintiffs their additional damages, plus interest as allowed by law, and punitive damages.

Dated:  October 9, 2009

WUERSCH & GERING, LLP
Attorneys for Plaintiffs

By:_____
Gregory F. Hauser (GH-3902)
100 Wall Street, 21st Floor
New York, NY 10005
(212) 509-4717