211.    Finally, Morgado has at least one connection with Florida.  In 1997, he incorporated the Portuguese Press Institute, Inc., there as a non-profit corporation.  Florida dissolved the corporation the next year for failure to file an annual report.

212.    iXOTIC has, despite repeated requests to Kammer, never received any confirmation that the payment by Templeton to AIGL was in fact effected.

213.    After iXOTIC came to the conclusion that the document Kammer initially supplied on March 23, 2007, a Funds Transfer Request dated March 21, 2007, for $685,993, did not even show that it had in fact been sent to the bank much less prove that the transfer had taken place, iXOTIC pressed Kammer again for proof of the payment.

214.    In response, on October 9, 2008, Kammer sent still another Funds Transfer Request, this time dated April 18, 2007, for $684,500, to entirely different account numbers in London.

215.    The address supplied for Deutsche Capital Holdings in Panama is simply a business center providing "virtual" offices, and its supposed website, www.deutschecap.com, was registered on August 24, 2006, to Deutsche Capital Holdings, Inc., of St. Kitts and Nevis, a registration that expired on August 24, 2008.  Internet information indicates that it has since been registered to Charmian, Ltd., which is, again, the purported lender in the alleged Lakeview Hotel fraud and one of the entities involved in the Templeton case investigated by the Manx FSC.

216.    iXOTIC never received an explanation of how, if loan proceeds had been already paid into escrow at Deutsche Capital Holdings, Chevalerie's subsequent transaction issues somehow meant that no funds were available.

217. According to corporate filings of public record, Deutsche Bank has a number of affiliates with names that begin with "Deutsche Capital", including Deutsche Capital Holdings Pty. Limited in Australia, but none named Deutsche Capital Holdings Inc.

218. The e-mails from Friedmann at Deutsche Capital Holdings, an e-mail from Buelowsky at AIGL and some of the e-mails from Kammer during the second half of 2007 and the first half of 2008 all originated from the same server in Saskatchewan, where Kammer was practicing medicine at the time.

219. Upon information and belief, none of Chevalerie, Deutsche Capital Holdings, Inc., Basil Buelowsky, Herman Edward Friedmann or Francois Couturier actually exists and all of them were invented by Kammer and/or other of the Defendants to deceive Plaintiffs.

220. The claim in early 2008 that Cheney had contacted Chevalerie about his commission was a now obvious falsification merely for the purpose of delay since Chevalerie never existed, although he may well have contacted other of the Defendants about his cut in the proceeds of the scheme.

221. Upon information and belief, Couturier was an identity initially created by Kammer and/or others to play Plaintiffs along until they could be put into Sampo's more experienced hands for an even larger hit, intending to play on the investment Plaintiffs had already made and their revealed susceptibility.

222. AMBROSIUS made total payments of €2,852,175.30 to AIGL and Templeton in connection with the AIGL and Chevalerie "Agreements".

**Fraud No. 2:  the Winthrop Transaction**

223.    Within the seventy-two hours promised by Couturier on October 28, 2008, iXOTIC received an e-mail from twbadmin@tweiselbrokers.com that read:  "Please find attached a letter with information of your interest."

224.    Attached was a letter on the letterhead of Thomas Weisel Brokers (hereinafter "TWB"), listing its offices as "UNITED STATES  CANADA  BRITISH VIRGIN ISLANDS  PANAMA"  but giving no street address, telephone or telecopy number, or any other contact or identifying information.  The letter, signed by a Dominic Bradley (whose position at TWB was never indicated), read in pertinent part as follows:

> Due to a financial restructure [sic], starting last October 17th, our
> institution has acquired part of the CHEVALERIE's active agreements.
> During the mentioned acquisition, we were told that an agreement signed
> on February 2007 [sic] with iXotic continues in open status.  We are
> interested in proceeding with the financial transaction initially agreed with
> Chevalerie.  In order to expedite the closing, our offices in Panama were
> assigned as the agents to provide the new agreement that will replace the
> one signed by Chevalerie.  A meeting between iXotic's principal and our
> representatives is required in order for both our companies to analyze
> more closely the new commitment to be signed.  We will arrange to meet
> iXotic, during the third week of November in our offices in Panama.
> Please let us know, as soon as possible, if the meeting date is comfortable
> for you.

225.    iXOTIC's attempt to reach the website www.tweiselbrokers.com resulted in their reaching www.tweisel.com, the website of Thomas Weisel Partners (hereinafter "TWP"), a legitimate investment bank based in San Francisco (a spin-off from the former Montgomery Securities), with offices in several cities in the U.S.A., Canada and Europe.  The pages of TWP's website display the same triple "swoosh" logo that was at the top of Mr. Bradley's letter.

226.    iXOTIC was leery of proceeding, but the legitimacy of Thomas Weisel Partners combined with the suggestion of the new contacts in Panama that the approximately €2.8 million

paid to AIGL could be salvaged for the new transaction, a major incentive, convinced them to go forward with the meeting.

227.    In addition, in reliance on the Chevalerie Agreement, iXOTIC had already signed a number of contracts with suppliers for the train project and was facing liability in the millions of euros.

228.    Bradley indicated by e-mail that Mario Sampo was the leader of the Panama City office.

229.    In early November, a P. D'Vandeul at Thomas Weisel Brokers (position unidentified) provided assistance by e-mail with the hotel reservations in Panama City for the iXOTIC delegation.

230.    In mid-November, iXOTIC's representatives, including Mr. Krail, Markus Wilmes, representing Ambrosius, and a Swiss attorney arrived in Panama City.  They met there with Sampo, who presented his business card from Universal Financial Group, at the offices of which in Avenida Federico Boyd, Torre Universal-Mezanine, Panama City, Panama, they were meeting.

231.    Also at the meeting were Alves de Melo and Anta, whom Sampo introduced as being from Thomas Weisel Brokers.  Anta presented a Thomas Weisel Brokers business card, with the same triple "swoosh" logo, showing an address of 390 Park Avenue in New York City, which is where Thomas Weisel Partners has its Manhattan office.  (The phone numbers, however, had an area code of 206, which is from Seattle, and the card also showed a "Bank line 228/21 – Nassau Bahamas".  iXOTIC's representatives were ignorant of the particular geographic significance of U.S. telephone area codes.)

232.    Sampo already had all the documents from the Chevalerie transaction.  He and his colleagues indicated that they and the UF Group were affiliated with Thomas Weisel and that they represented a number of investors, from Canada and elsewhere, interested in providing the financing desired by iXOTIC and who would be acting through a Bahamian company affiliated with Thomas Weisel, and presented a proposed term sheet.

233.    Sampo and company told the iXOTIC representatives that some of the terms were negotiable and others -- such as an interest rate of eight percent if the loan would be made in dollars and ten percent if in euros -- were not.

234.    The two groups then proceeded to negotiate and to effect the transaction which, all in all, took about two months in Panama City.  The negotiations and other dealings were conducted for the most part in Spanish and Portuguese, although all the transaction documents were in English.

235.    After each round of negotiations, Sampo and company told the iXOTIC representatives that the results and the documents had to be sent to Thomas Weisel in the United States for approval or other reaction, for which the iXOTIC representatives then had to sit in Panama City and wait.

236.    Among the terms would be that the loan would be secured by a key man insurance policy on Mr. Krail and also that iXOTIC would place its share certificates in escrow.

237.    In connection with the first of these, Mr. Krail was sent by Sampo to a medical examination by Dr. Abelardo E. Saldaña, a family medicine specialist, at the Family Care Medical Clinic in Panama City, and for blood tests at a medical testing laboratory.  The insurance was to be provided by Interoceánica de Seguros, webpage at:

http://www.interoceanica.com/english/direccion.html.

238.    To fulfill the other security guaranty, on December 3, 2008, Mr. Krail instructed that the share certificates for iXOTIC be delivered to him at the Hotel El Panamá in Panama City.  He delivered them to Anta at the TWB offices in Panama City on December 6 or 7, 2008, to be held in escrow at the account of International Escrow Systems Inc. a/k/a I.E.S. Inc. at JPMorgan Chase Bank in New York City.

239.    Sampo and his colleagues gave instructions that the initial payment towards the key man insurance premium also be paid into escrow for a period of thirty days, also into the I.E.S. Inc. account at JPMorgan Chase Bank in New York City, in order to provide temporary coverage as a condition for the release of the loan funds, at which time the coverage would become permanent.

240.    On December 8, 2008, AMBROSIUS paid $132,701.50 into I.E.S. Inc.'s JPMorgan Chase Bank account in New York City, no. 693 502 969 265.

241.    By early December, Sampo and company presented iXOTIC's representatives with a fully drafted "Credit Facility Agreement" for $165 million with Winthrop Investments Limited, a Bahamian corporation (hereinafter "Winthrop"), signed on its behalf by a Ronald Eduard Norman (hereinafter the "Winthrop Agreement"), described in the recitals as "its manager authorized for this act" but with his post otherwise unstated.  The loan was to be paid out in tranches and repaid in eighteen semiannual payments, beginning one year from the release of the first tranche with interest at 8.25%, although the first year's interest of $13,612,500 would be added to the principal amount of the loan.

242.    The contract appeared legitimate and business like.  A significant portion of the Winthrop Agreement concerned the security, guarantee and documentary obligations of iXOTIC and Mr. Krail, not surprising for a loan of this size.

48

243. On or about December 14, 2008, Mr. Krail signed the Winthrop Agreement both on behalf of iXOTIC and on his own individual behalf as guarantor.

244. The Winthrop Agreement required as a condition for closing the production by iXOTIC and Mr. Krail of a significant body of documentation (all in triplicate, an original with Mr. Krail's notarized signature on every page plus two notarized copies of the original), which they set about assembling. The contract provided that the determination whether the documents complied with the requirements would be made within a week of filing and that the first tranche would be paid out within seven business days from certification of documentary compliance, but also imposed a ten day time limit from signature for filing of the required documents.

245. Mr. Krail and some of the iXOTIC delegation remained in Panama City. The distance and the approaching holidays delayed assembling the required documents, and then, at a meeting with TWB, a communication from Winthrop's document review company was delivered giving iXOTIC notice of a minor discrepancy involving the iXOTIC board resolution, which required still more time to rectify.

246. On December 30, 2008, Mr. Krail and the other iXOTIC representatives received a letter from a Lic. Juan Echeverría purporting to be from the legal department of TWB (no address given) notifying iXOTIC that the documentation deadline had been missed but also pointing out that the contract allowed iXOTIC to purchase an extension of up to thirty days by making a payment of the interest due on the loan principal for the time period of the extension, up to a maximum of $850,781.25 for the maximum extension of thirty days.

247. On December 30, 2008, AMBROSIUS arranged for payment of $483,645.90 into the designated account of I.E.S. Inc., also at JPMorgan Chase Bank in New York City, a

different account with the number 693 615 842 165, which payment was effected as of January 2, 2009, and which Plaintiffs understood extended the deadline to January 13, 2009.

248.    When it did not appear that iXOTIC would meet that extended deadline either, on January 12, 2009, AMBROSIUS paid another $368,671.87 into the same account to acquire the full thirty day extension.

249.    That second extension payment was made before iXOTIC received a copy of a letter dated January 9, 2009, from a John Brommer at Prince International Survey Associates Inc. (no address or other contact information given) addressed to Winthrop, certifying that there had been compliance with the Winthrop Agreement's documentation requirements for iXOTIC.

250.    Finally, on January 21, Sampo and company presented the iXOTIC representatives with a printed-out two page "Closing Position". The document confirmed the satisfaction of the documentation requirements under the Winthrop Agreement but showed unpaid contractual expenses and fees of $7,342,400, amounting to 4.427% of the loan principal, laid out in Appendix IV as "Spread: 0.852% - Registration: 1.15% - Clearstream: 0.23% - Issuance: 0.35% - Administration: 1.20% - Transaction: 0.125% - Legal/Accounting: 0.52%".

251.    Mr. Krail nonetheless signed the Closing Position based on explicit oral statements by Sampo that the fees could be paid from the initial loan proceeds.

252.    Mr. Krail and the iXOTIC representatives then returned to Europe.

**Post-Panama:  Payments Into Perpetuity**

253.    On January 27, 2009, Bradley of TWB notified iXOTIC by e-mail that funding of the loan awaited iXOTIC's covering those fees.

254.    iXOTIC protested that they were to be paid from the initial working capital portion of the loan, as Sampo had assured iXOTIC's representatives.

255. TWB did not relent and insisted that the fees be paid up front.

256. This was beyond the capabilities of iXOTIC and AMBROSIUS.

257. Sampo offered to help by arranging for coverage of some of the fees through recovery of some of the money previously paid to AIGL.

258. After supposedly being in contact and negotiating with AIGL, Sampo had Mr. Krail sign, on February 13, 2009, an "Approval of Recovery Value from AIG" in the amount of $3,133,744 less expenses of $109,681.04 for a net of $3,024,062.96.

259. On February 18, Bradley of TWB confirmed by e-mail that this net amount from AIGL had been credited to the I.E.S. Inc. account.

260. That left a balance of the contractual fees and expenses due of $4,318,337.04, an amount confirmed on February 26 by e-mail from a P. Terence at TWB (position unidentified).

261. Sampo then proposed that this balance be covered by a separate bridge loan, and he brought into the picture an American company by the name of Eurofunds International LLC (hereinafter "Eurofunds"), based in Arlington, Virginia, which offered to provide a loan in the amount of $4,415,000, the net proceeds from which (after expenses) would be paid over to cover the remaining balance due for the contractual fees and expenses for the Winthrop Agreement (the "First Bridge Loan").

262. Sampo also agreed to a side agreement between iXOTIC and TWB guaranteeing the closing of the main loan upon full coverage of the remaining balance of the contractual fees and expenses, which was prepared by iXOTIC.

263. On March 19, 2009, Sampo sent to iXOTIC a Credit Agreement between Eurofunds and iXOTIC, signed for Eurofunds by a Raald Duart Laman, whose position at Eurofunds was not stated, for $4,415,000 at 10.25% interest, which required deposit of a

collateral guaranty in the amount of fifteen percent of the loan amount and repayment in twelve

monthly payments of $367,916.67 beginning thirty days after release of the loaned funds, which

would be reduced by expenses of $94,370.63 to a net loan of $4,320,629.37.

264. On March 20, 2009, Sampo signed the side agreement between TWB, "main

offices: Nassau, Bahamas" and iXOTIC. The side agreement included a provision requiring

TWB to provide to iXOTIC a copy of Winthrop's certificate of incorporation within forty-eight

hours of the release of the funds for the First Bridge Loan.

265. Also on March 20, 2009, both of these two new agreements were signed on behalf

of iXOTIC by its attorney along with twelve promissory notes for the installment repayments

and two funds transfer requests authorizing Eurofunds to pay itself the $94,370.63 in expenses

and the net loan proceeds of $4,320,629.37 to the I.E.S. Inc. account at JPMorgan Chase in New

York City.

266. On March 23, 2009, AMBROSIUS paid $662,250 as the required collateral

guaranty to Eurofunds' account, also at JPMorgan Chase Bank in New York City, no. 693 615

791 266.

267. At the beginning of April 2009, iXOTIC inquired about the failure of any of the

main loan proceeds yet to be available.

268. Bradley, in an e-mail response on April 7, 2009, although he had earlier

confirmed actual receipt of the full $3,024,062.96 from AIGL, claimed a discrepancy in the

amount available from AIGL, namely, that its "ledger" showed only $2,754,792 available, which

left $378,952 still owed.

269. It took the remainder of April to settle the AIGL matter, including the drafting

and signing of a General Release in favor of AIGL by iXOTIC and Mr. Krail, dated April 30,

2009, which was sent to iXOTIC on or about April 30, signed by Buelowsky and was then countersigned by Mr. Krail.

270.    To try to protect itself, iXOTIC had also sought another side agreement between iXOTIC and TWB providing closing assurances, this time also personally guaranteed by Sampo, and Sampo agreed.

271.    This second side agreement was signed on or about April 30, 2009, by Sampo for both TWB and himself, and was then countersigned on behalf of iXOTIC and by Mr. Krail as an individual guarantor of the payment of the remaining $378,952.

272.    This side agreement included a provision requiring that TWB provide within seven days a great deal of documentation to iXOTIC, including account balance statements of all the escrow accounts at JPMorgan Chase, the signatories for all those accounts, commercial register extracts for TWB USA, TWB Panama and TWB Bahamas, the business address and contact data of Eurofunds, and the key man insurance policy documentation and number.

273.    On May 5, 2009, AMBROSIUS paid the $378,952 into the I.E.S. Inc. account at JPMorgan Chase Bank in New York City, no. 693 615 842 165.

274.    On May 25, TWB informed iXOTIC by e-mail that its bank in Switzerland had been sent a SWIFT communication from Panama on May 22 and provided the SWIFT transmission details.

275.    iXOTIC's Swiss bank, in response to iXOTIC's inquiry, said that it was unaware of any such communication.  iXOTIC so notified TWB.  TWB then on May 27 provided SWIFT transmission details again, which this time, however, were slightly different.  iXOTIC contacted its Swiss bank again but, in response to this second inquiry by iXOTIC, its Swiss bank said that

it would not comment on any SWIFT communication unless it involved an actual receipt of funds.

276.   TWB subsequently provided to iXOTIC by e-mail a copy of the supposed SWIFT transmission, which said: "WE, BANCO NACIONAL DE PANAMA . . . HEREBY CONFIRM, WITH FULL BANK RESPONSIBILITY AND LIABILITY BY INSTRUCTIONS OF WINTHROP INVESTMENTS, INC. THE CLOSING OF THE TRANSACTION C.F.A. NUMBER 03255-1028 BENEFICIARY IXOTIC AG . . . CONDITIONED TO [sic] PAYMENT OF COUPONS PN 029/0309-1 AND PN 028 0309-2".

277.   This last was a reference to the fact that the first two payments due under the First Bridge Loan had come due. On May 25, Bradley informed Mr. Krail that, based on the SWIFT communication, those had to be covered before the main loan could close.

278.   On May 27, 2009, AMBROSIUS paid $813,728.99 to Eurofunds' account at JPMorgan Chase Bank in New York City, no. 693 615 791 266, to cover those two payments.

279.   On June 12, 2009, iXOTIC's attorney reminded Sampo of the overdue obligations to provide a copy of Winthrop's certificate of incorporation and to make the initial payments from the Winthrop loan to iXOTIC's suppliers.

280.   That same day, Bradley of TWB e-mailed Mr. Krail that that the first release of the main loan funds would be granted within "48 banking hours" and that the release information would be sent to iXOTIC's bank on June 16, 2009.

281.   On June 16, 2009, came an e-mail from a Mike Bernard at TWB, whose position there was unstated, detailing $52,712,391.26 in loan payments to iXOTIC and its suppliers – the first tranche -- that had been authorized, conditioned, however, on "immediate coverage of the value due on [sic] Clause 28", namely, $3,998,671.88.

54

282.   Bernard claimed to be with TWB in New York and provided iXOTIC with a number from the 212 area code, stating that it was his "personal and direct telephone number", at which "[y]ou can reach me during office hours . . . from 9:00 AM until 5:00 PM eastern time" and at which number Mr. Schreyer has spoken with him on more than one occasion.

283.   iXOTIC replied the next day protesting that nothing more could be due, pointing out that the two side agreements between TWB and iXOTIC specifically said nothing more would be due before closing.

284.   TWB, however, was taking the positions that all the delays up to that date were the responsibility of iXOTIC and that Clause 28 required payment of approximately ninety-nine days of interest on the full loan principal.

285.   iXOTIC's attorney sent an e-mail echoing the insistence that nothing more was due.

286.   On June 18, Bernard e-mailed back that TWB's loan committee had met and, based on the side agreement of April 30, had reduced the liability to $2,807,578.17, but the interest until that date would still have to be covered.

287.   iXOTIC protested and again disputed that there was any additional liability.

288.   Sampo pressed for payment of the interest and suggested payment into a different I.E.S. account than had been used to date, no. 693 615 791 255, at JPMorgan Chase Bank in New York.  On the Escrow Account Application he provided in connection with the proposed payment of $2,808,700.43 (the interest liability plus $1122.26 in legal, insurance and administration fees), the beneficiary shown was "Winthrop Investment [*sic*] Ltd.", and the beneficiary's authorization was to be signed by Ronald Eduard Noman, supposedly bearing a U.S. Passport, no. 035916339.

289.    On June 24, Bernard in a telephone conversation with Mr. Schreyer and by e-mail to Sampo, which he forwarded to iXOTIC, said that he would keep the contract open for no longer than forty-eight hours.

290.    iXOTIC continued to resist any further liability.

291.    Meanwhile, the third payment due under the First Bridge Loan was also coming due.

292.    Ultimately, with the threat of TWB in New York hanging over the transaction, Sampo proposed and managed to convince Plaintiffs to enter into a second bridge loan transaction along the same lines as the first, except that the total amount would be $3,219,567 (the "Second Bridge Loan"), and iXOTIC secured the concession that there would be a third side agreement with TWB that would be guaranteed by "T. Weisel Partners Inc." (hereinafter "TWPI") in New York and signed by Mike Bernard.

293.    On or about June 29, iXOTIC received the second Eurofunds Credit Agreement, again signed by Laman, and the third side agreement with TWB, signed by Sampo with a signature line prepared for TWPI by Mike Bernard, and they were countersigned on behalf of iXOTIC and returned.

294.    Also on June 29, 2009, AMBROSIUS paid $1,228,000 as the required collateral guarantee for the Second Bridge Loan into Eurofunds' JPMorgan Chase Bank account in New York City, no. 693 615 791 266.

295.    From the Second Bridge Loan, $2,800,700.43 was allocated to the interest liability and $418,866.57 to payment of the promissory note under the First Bridge Loan with interest.

296.    On June 30, 2009, iXOTIC received an updated closing position for the Winthrop Agreement, dated June 29, 2009, and showing "SITUATION:  Clear."

297.    Also on June 30, iXOTIC received a copy of the third side agreement with TWB signed by Mike Bernard for TWPI and a letter from Noman at Winthrop acknowledging "our accordance" with the side agreement.

298.    On the same day, iXOTIC received a statement, dated June 30, 2009, showing balances in two different accounts of I.E.S. Inc. at JPMorgan Chase Bank in New York City: $132,236.70 for the key man insurance policy; and $7,340,171.53 for the contractual fees and expenses.

299.    Not long after, iXOTIC finally received a notarized Certificate of Good Standing for Winthrop, dated June 30, 2009, from the Commonwealth of the Bahamas, although TWB never provided a copy of the Certificate of Incorporation.

300.    On July 3, 2009, iXOTIC received by e-mail from TWB a telecopied communication from a Justin E. Bagdad at Eurofunds' Credit Department (no other indication of his specific position was stated), showing a telecopy number with a New York City area code (646), confirming receipt of the collateral guarantee payment.

301.    On July 10, 2009, iXOTIC received via e-mail from twbinfo@tweiselbrokers.com confirmation from Eurofunds, showing that it had been telecopied from the same New York City number and saying that the obligations under the First Bridge Loan were "properly updated" along with copies of the first three promissory notes, all also displaying the same New York City number in a telecopy transmission line, showing that they had been cancelled.

302.    On July 9, 2009, however, iXOTIC had received an e-mail from Bradley enclosing an escrow statement from I.E.S. Inc. showing that, on July 7, $18,892,400 had been

57

deposited into one escrow account and \$146,107,600 into another but noting "a [*sic*] open debit related to the updating of the credit line from 06/25/09 until 07/07/08 [*sic*] in a total of \$340,312.56. This issue must be resolved in order for us to start the releasing process."

303.    iXOTIC resisted paying any more until it actually received the loan funds.

304.    Bernard insisted on July 13, 2009. that "since the contract is out for clearing, a passive interest has to be applied for those days prior to the funding of the escrow accounts".

305.    Under a renewed threat that the loan proceeds would be held in escrow for only a limited time, on July 14, 2009, AMBROSIUS paid \$340,312.56 into the I.E.S. Inc. account at JPMorgan Chase Bank in New York City, no. 693 615 842 165.

306.    On July 15, 2009, Bradley claimed that the funds had gone to the wrong escrow account and that it would take forty-eight hours to redirect the funds.

307.    On July 17, 2009, iXOTIC emailed TWB expressing astonishment that neither Sampo nor Bernard could be reached by telephone and asking for evidence of the first transfers scheduled under the loan.

308.    On July 20, 2009, an R. Morales at TWB (his position was unstated) replied "we would like to inform that today were [*sic*] requested to our administration the position in regards to the iXotic releases. We expect to have the exact situation and the planned schedule at the end of the day or later tomorrow, then will keep you informed."

309.    On July 21, 2009, Bagdad at Eurofunds requested payment of the next installment for repayment of the First Bridge Loan, \$367,916.67, which had been due the day before, on July 20, 2009.

58

310. On July 22, 2009, iXOTIC sent an e-mail requiring confirmation of payment of the first funds releases under the loan and, if not received, threatening to turn the matter over to its attorneys.

311. On July 25, 2009, iXOTIC received an e-mail supposedly originating from TWB's Legal Department and otherwise unsigned saying that "[i]n order to answer your request properly we have contacted our administrative department for the right orientation in this matter" but also that the payment due Eurofunds on July 20 would have to be made before the transaction could proceed.

312. On July 26, 2009, iXOTIC again protested that there had been an oral modification to the agreements and that the amount was therefore not due until July 30th, and that release of the main loan funds was overdue, and requested a meeting in New York the following week between iXOTIC's attorneys and TWB's "empowered representative".

313. An e-mail response was sent from Panama on July 27, 2009 (received by iXOTIC on July 28 since it was already after midnight there) purporting to be from a Fred E. Peterson from TWB's Legal Department and stating that any meeting would have to be with "the agents in charge of your contract, in their local offices" and that "[i]n addition, we would like to confirm, that your creditor informed today the period that was granted to keep the iXotic's debt unpaid according to a Promissory Note in arrears, will expire. They also notify that if the mentioned debt remains uncovered after tomorrow (July 28, 2009) they will claim an immediately [sic] return of the available funds as per clause 8th of the credit agreement signed and recognized by your company."

314. Under this threat, on July 28, 2009, AMBROSIUS paid $367,916.67 to Eurofunds' account no. 693 615 791 266 at JPMorgan Chase Bank in New York City.

315.     A meeting was set up in Panama City for July 30 but then cancelled, and, on August 4, 2009, Bagdad of Eurofunds requested payment of the next promissory note payment due.

316.     There was discussion of a meeting in August 10, 2009, but it was not confirmed, and on that day Bradley requested that the payment to Eurofunds be made before the loan transaction could proceed.

317.     On August 12, 2009, iXOTIC took the position that Winthrop, TWB and TWPI had gone into default on their obligations and that iXOTIC would pay Eurofunds only upon release of the main loan proceeds to iXOTIC and/or its suppliers.

318.     Bradley responded that, since the next promissory note was not due until August 31, 2009, prompt payment of the amount due Eurofunds from July 31 would allow time for the main loan transaction to close.

319.     iXOTIC responded by again requesting that the main loan proceeds first be released.

320.     Between then and late September 2009, the parties' positions did not materially change beyond a suggestion by Sampo that iXOTIC's representatives should come to Panama to meet and to try to find a solution.

321.     On September 18, 2009, Peterson of TWB's Legal Department e-mailed iXOTIC that "we interceded with your creditor in order avoid [*sic*] the contractual cancellation and adjust new credit agreements on the bases of quarterly repayments to postpone the payment of the due balances of both credit agreements." Attached was a letter signed by Bagdad at Eurofunds setting up new terms with quarterly repayments due at end of the last month of the quarter but "[a]s a main condition to get the issuance of new contracts, iXotic will have to cover the amount

of unpaid interest due until September 20, 2009 whose total is $171,343.41 . . . [and] the new contracts . . . must be signed and guaranteed by Mr. Krail." The letter also said that iXOTIC would have to pay fees and expenses of $192,889.38.

322.    Despite repeated requests from iXOTIC, other than supposed statements of the balances in the escrow accounts, TWB has declined to provide the rest of the documentation required by the side agreements, including a failure to provide an actual street address, or telephone or telecopy numbers, or e-mail address, or any other contact information for either I.E.S. Inc. or Eurofunds.

323.    Indeed, Sampo has orally repudiated the three side agreements on the claimed ground that they were never formally integrated with the Winthrop Agreement.

**The Winthrop Reality**

324.    Internet diagnostics show that the e-mail from Couturier on October 22, 2008, mentioning the possible timing of a meeting with the replacement lender for Chevalerie came from a computer in Panama City, Panama.

325.    Upon information and belief, by this time, Kammer had handed over the Couturier identity to Sampo, and the e-mails from Couturier were nothing more than a means to continue and to expand on the Chevalerie/AIGL fraud.

326.    Based on the information detailed herein, it is now Plaintiffs' firm belief that Sampo, Alves de Melo, Anta, the UF Group, P. D'Vandeul (actually Patrick de Vandeul), Bernard, I.E.S. Inc., Eurofunds, and, to the extent that they may actually exist, TWB, Winthrop, TWPI and the other people whose names appear on their documents and the e-mails from TWB and UF Group, had no purpose, intent or design other than to bilk the Plaintiffs.

327. Upon information and belief, the entire Winthrop transaction, including the dealings with TWB, I.E.S. Inc., Eurofunds and TWPI, from Bradley's initial letter to iXOTIC through now, was and continues to be a charade and a fraud, with no intent by any of the people or companies involved, to the extent they actually exist, to provide any financing to iXOTIC, much less any actual escrow services, key man insurance, bridge loans, or any other services, all designed simply to extract as much money from the Plaintiffs as possible.

328. In retrospect, as with the Chevalerie fraud, what can now be seen as a significant set of odd and less than fully intelligible provisions in the transaction documents, careless errors of English and typographical errors, customary provisions that are missing, and inconsistencies among the documents, company information and communications, together help show the illegitimacy of their enterprise.

329. Upon information and belief, the statements and representations detailed here and made by Sampo, Alves de Melo, Anta, , I.E.S., Inc., Eurofunds, Bernard and/or the UF Group, either on their own or *via* communications or agreements signed by TWB, Winthrop, TWPI, Banco Nacional de Panama, Norman/Noman, Bradley, Echeverría, Brommer, Terence, Morales, Peterson, Laman, Bagdad, or the U.S. agents for Eurofunds and/or I.E.S. Inc., including: the statements and representations about their working towards and/or willingness to enter into and fulfill the transactions discussed, the existence, substantiality, capabilities and affiliations of the companies and others they claimed to represent and/or presented, any due diligence supposedly conducted by any Defendant concerning any entity other than Plaintiffs and iXOTIC's suppliers, the necessity of any release for the transaction to proceed, and the intent and legitimacy of all the signed agreements; the confirmations of money transfers other than those by AMBROSIUS; and the bank and escrow account statements and other statements or representations about money on

deposit in the name or to be at the disposal of iXOTIC or about money or other property being held in escrow, were knowingly false when made, and made with the purpose to deceive Plaintiffs and with the intent that Plaintiffs rely on those statements and representations to the financial detriment of Plaintiffs and concomitant benefit of the Defendants.

330.    Plaintiffs did in fact, in their earnestness to achieve the financing, rely on those statements and representations to Plaintiffs' direct financial detriment and other injury, and but for those false statements and representations Plaintiffs would not have made the payments to I.E.S. Inc. or Eurofunds.

331.    Their earnestness was fuel for a machine run by experienced crooks.

332.    According to news reports and reports of legal proceedings, Sampo and at least two of his friends have been pursued for multi-million dollar frauds before and Sampo has been involved in more than two dozen civil and criminal proceedings in Panama.

333.    According to those reports:  Sampo is Italian-Brazilian and arrived in Panama in 2000.  In 2003 Sampo was involved in a fraud in which he and several associates, including Patrick de Vandeul and Alves de Melo, promoted financial services over the internet using the name of Tempus Bank.  Several people deposited money there, up to the hundreds of thousands of dollars each, but, when they went to withdraw it, encountered nothing but objections about why they could not.  It turned out that, despite claims by Sampo *et al.* that the bank was based in Montenegro and/or Latvia, it did not legally exist anywhere.  Tempus set up several front companies in Panama, including Universal Financial Group, Inc., all of which are on a "warning" list of entities not authorized to engage in the banking business in Panama posted by the Panamanian Superintendency of Banks:  http://www.superbancos.gob.pa/advertencia/list.asp (as well as on a list of entities with licenses revoked by the Seychelles Islands).  A couple of

years later, Sampo was accused of swindling a Panamanian businessman of $16 million and, in January 2006, he was arrested.

334.    According to public records, Sampo had a Florida driver's license that expired in 2004 and has had, at least in the past, an address there:  10205 Collins Avenue #501, Miami Beach, Florida  33154.

335.    Also according to Florida records, Sampo, like other of the Defendants, was involved in the incorporation of several Florida corporations that are now inactive:  First Union International Finance Corp. (incorporated in 1998; inactive since 2000);  Conex Travel Corp. (incorporated in 1999; inactive since 2000); Colombine Corporation (incorporated in 1999; inactive since 2000); and Listotec Import Export S.A., Inc. (incorporated in 1999; inactive since 2000).

336.    One of the other officers/directors of Conex Travel Corp. is listed as Wittenberg M. Rebeiro, who is, upon information and belief, the same Wittembergue Magno Rebeiro who was head of the accused criminal gang arrested in 2007 in Brazil that also included Leite.

337.    Upon information and belief, there is no such entity as Thomas Weisel Brokers and the name is no more than a deceptive D/B/A for the UF Group and/or Sampo and colleagues.

338.    The e-mails signed by either Sampo or anyone else from the UF Group have all come from the tweiselbrokers.com domain or on a few occasions from universal.associates@gmx.com.

339.    Internet diagnostic shows that the e-mails from P. D'Vandeul and P. Terence, and most of the e-mails from Sampo, Bradley and Peterson from TWB and/or from the UF Group have all come from the same computer in Panama City, Panama, as have some of the e-mails from Bernard.

340.    Some of the e-mails from Sampo, Bradley and Peterson have come from a second computer, some of the e-mails from Sampo and Bernard have come from a third computer, and one of the e-mails from Bradley came from a fourth computer; all these computers are in Panama City, Panama.

341.    The internet domain tweiselbrokers.com was, at the time iXOTIC began dealing with TWB, registered to TWB at 390 Park Avenue in Manhattan – the actual New York City address of Thomas Weisel Partners – with the contact person listed as Teresa Weisel. That domain today is registered with Domains by Proxy, a service designed to enable domain registrants to hide their identity. The link to the website of TWP no longer functions.

342.    According to its website, the legitimate investment bank of Thomas Weisel Partners has no offices in any of Panama, the British Virgin Islands or the Bahamas. According to information from TWP's legal department in San Francisco, it has never had offices in any of those locations, it has no affiliate by the name of, and has not done business under the name of, Thomas Weisel Brokers, has had nothing to do with the domain tweiselbrokers.com, has never heard of any of Teresa Weisel, Dominic Bradley, Mario Sampo, Ricardo Anta, Valter Alves de Melo, P. D'Vandeul, P. Terence, R. Morales, Mike Bernard or Fred E. Peterson, and has certainly never authorized any of them to claim any connection with TWP.

343.    Upon information and belief, Dominic Bradley does not even exist, nor does any of Juan Echeverría, P. Terence, R. Morales or Fred E. Peterson, or, at the very least, they are not legitimately employees or agents of TWB, since it does not exist.

344.    Winthrop may or may not exist. The only information available on line from the Bahamas is whether the company name is available; "Winthrop" is not. There was once a

company by the name of Winthrop Investments Limited in Australia, but it was merged into another company in or about 1984.

345.    Winthrop's address listed on the Credit Facility Agreement is the address for the Bahamas office of a Panamanian law firm.

346.    The "Certificate of Good Standing" for Winthrop, dated June 30, 2009, and presented to iXOTIC is almost certainly a fraud.  It bears the notarized signature of Oswald E. Freeman as Acting Registrar General.  The website of the Bahamian government lists the Acting Registrar General as Ms. Jacinda Butler, and other internet information indicates that she has been in that post since at least 2008 and continues in that position.  There is no internet indication that an Oswald E. Freeman exists anywhere, much less has had any position with the Bahamian government.  The notary on the document, Willian Rennan McKulyns, is not on the list of registered notaries available at the website of the Bahamian government, nor is there any internet indication that he exists anywhere.

347.    The Winthrop Agreement is riddled with errors and incongruities.  In its first paragraph, it states that Winthrop is represented by "Mr. RONALD EDUARD NOMAN", but the several signature lines, on the main Agreement and the three appendices, were all prepared for "Ronald Eduard Norman."  Although the lender is Winthrop, recited as a Bahamian corporation, the seals applied to each of the several signature pages are for "Thomas Weisel Brokers United Kingdom"; the TWB letterhead listed no office in the United Kingdom.

348.    The Prince International Survey Associates Inc. letter memorandum is addressed to Mr. Ronald E. Noman at Winthrop.  There is no internet indication that either Prince International Survey Associates Inc., Noman – perhaps intended to read that way, indicating "no man" -- or Norman exists and, upon information and belief, none of them does exist.

349.     The Winthrop Agreement has a number of clauses headed "Sole Paragraph", a term that has no legal meaning in English but appears to be a translation of a Spanish legal term, *único*.

350.     Although supposedly prepared in the United States for a Bahamian corporation, two English speaking jurisdictions, the Winthrop Agreement reads in many places as if it had been translated from Spanish.  There are many errors and other oddities in the Agreement's language.  As examples:

"The **LENDER** does hereby grant the **BORROWER** a financial loan . . . from a clear and clean funding source . . . .";

"the **BORROWER** does hereby bind itself to repay the **LENDER**, on an unconditional, irrefutable and unrestrictive basis . . . .";

"In the assumption of the incidence of the borrowing rate provided for in Clause 28, the value shall be paid off upon the request for a term extension submitted by the **BORROWER**, pro rata the period agreed upon.";

"Through the representative and per se, the **GUARANTOR** do hereby expressly . . . .";

"The **GUARANTOR** does hereby . . . .  [following sentences, still referring to the Guarantor:]  They also . . . .They further . . . .";

"Likewise, it is hereby acknowledged that the transaction governed hereby does not propose any kind of change in the terms hereby agreed upon . . . .";

"A detailed breakdown of the guarantee offered as substituting . . . .";

"Consequently, in case a legal action is filed to collect overdue and unpaid amounts, the **LENDER** shall not be obligated to prove that the overdue obligations in arrears are those expressed in the complaint, the amounts declared by the **LENDER** being taken as

correct, liquid, and enforceable, which shall be of good faith, turn the action into a summary proceeding, and cause all relevant effects.";

"The parties further agree that . . . does not imply the remission, innovation, pardon, waiver or alteration of the terms agreed upon."; and

[this is the entire sentence] "Any other cause not within the control of such party or which is by exercise of reasonable diligence, the party will be unable to foresee or prevent or remedy."

351.     The Credit Agreements between iXOTIC and Eurofunds for the First and Second Bridge Loans each recite that Eurofunds International LLC is "incorporated and organized under the sovereign laws of the United States, main offices in Arlington, Virginia, registered under ID No.:27-0088314", an identification that any American attorney or one sophisticated in such matters would recognize is bogus but which appeared perfectly plausible to Europeans not fluent in English and inexperienced in such matters.

352.     The Credit Agreements also each state: "This agreement shall be construed and governed exclusivity [sic] in accordance with the Laws of the United States of America, and subject to the jurisdiction of the Court of New York City, in order to adjust any conflicts or disagreements, without exception, being privileged over any other court." (The three side agreements between TWB and iXOTIC have an almost identical clause, which iXOTIC simply copied from the Credit Agreements, although the three side agreements at least used the grammatically correct "exclusively".)

353.     These clauses are ones that any attorney licensed in any state in the U.S.A. would recognize as ineffectual, but that recognition requires more knowledge of English and the details of the legal and judicial systems of the U.S.A. than the Plaintiffs or their Swiss attorneys had.

354.    Those same side agreements between TWB and iXOTIC identified TWB as having its main office in the Bahamas even though its letterhead listed no such office and the website of TWP, of course, also shows no such office.

355.    In addition, the idea that an individual executive of a broker such as Sampo would personally guarantee the obligations of the broker and one of the principals to the main transaction is specious.

356.    Interestingly, the escrow account statement received by iXOTIC on June 30, 2009, showed a file date of June 30, 2009 and transactions through late March 2009, but also that it was printed on January 21, 2009.

357.    Upon information and belief, neither International Escrow Systems, Inc., nor Eurofunds International LLC actually exist as entities formed in any U.S. jurisdiction by those exact names, but those names were D/B/A designations for other actual entities with similar names, D/B/A designations chosen for their similarity with other legitimate business entities in the U.S. which were not involved with the dealings with Plaintiffs, such as International Escrow Services, Inc., based in Atlanta, and Eurofunds International, Inc. (not LLC), based in Maryland (not Virginia).

358.    Upon information and belief, "Eurofunds International LLC" was a D/B/A for Defendant Eurofunds Administration LLC, which was formed in March 21, 2004, by a New York attorney, A.G.

359.    Upon information and belief, "International Escrow Systems, Inc.," was a D/B/A for some entity with a similar name and the name of which had the same initials, an entity (like Defendant Eurofunds) formed somewhere in the United States to facilitate having bank accounts here.

360.     While the JPMorgan Chase Bank accounts for I.E.S. Inc. and Eurofunds are in New York City, those accounts were apparently opened at an outer borough branch in the Queens neighborhood of Astoria, which is not where entities engaged in legitimate major, sophisticated international financial transactions would be expected to do their banking, but the distinction between Astoria and Manhattan was lost on the Plaintiffs.  Interestingly, internet information indicates that the telecopy number from which communications from Eurofunds originated is located in this same part of the New York City Borough of Queens, and the attorney A.G. that formed Defendant Eurofunds Administration LLC has an office in Astoria.

361.     The General Release of AIGL by iXOTIC was signed by Basel Buelowsky, and his signature was notarized by a New York notary, even though they had been dealing with Basil Buelowsky in Miami.  Upon information and belief, there is also no Basel or Basil Buelowsky in existence.

362.     Buelowsky's signature purports to be notarized by Donald J. Hartnet, but the notary stamp does not, as is customary, identify the county in which the notary public is qualified in New York, and the New York State Secretary of State's listing of qualified notaries public does not include a Donald J. Hartnet.  There is no internet indication that a Donald J. Hartnet exists, which is unusual for a notary public, and, upon information and belief, he does not exist.

363.     Mike Bernard's New York telephone number was not even the same exchange as for TWP's New York City office in East Midtown Manhattan.  Bernard's number is an unlisted number; the available information indicates that it is a landline located in West Midtown Manhattan.

364.     The signatures of Noman/Norman at Winthrop and Laman at Eurofunds are consistent, indeed, identical to the point that they do not appear to have been applied by human

hands. The different communications from Bagdad at Eurofunds in New York City, however, do not appear consistent in their signatures. In addition, the July 3, 2009, confirmation from Bagdad at Eurofunds, a single page form, showed his name in one place as Bagdad and in another as Bagdag; one does not customarily sign a document in which his own name is misspelled, as supposedly have Messrs. Bagdad and Norman/Noman. Upon information and belief, as with Norman/Noman, neither Laman nor Bagdad exists, but there is/are/was/were one or more agent(s) for Eurofunds and I.E.S. Inc. in New York City.

## The Damages

365.     Payments by AMBROSIUS in connection with the Winthrop and related transactions totaled $4,776,179.49.

366.     Between the two parts of the Defendants' fraudulent scheme, the payments to the Defendants by AMBROSIUS  (at current exchange rates) total $8,975,722.40.

367.     iXOTIC is indebted to AMBROSIUS for that amount.

368.     In addition, in connection with the two sets of transactions, iXOTIC and AMBROSIUS incurred and paid travel, personnel, interest and other direct costs of over one million dollars, and keeping iXOTIC afloat while waiting for the financing that never materialized has cost Plaintiffs in excess of another one million dollars.

369.     iXOTIC has outstanding invoices from suppliers for orders placed in anticipation that the Chevalerie and/or Winthrop financings would come through totaling almost six million euros.

370.     iXOTIC is now insolvent and effectively out of business.

371.     AMBROSIUS is unable, and will never be able, to collect any of the debt from iXOTIC.

372.    Mr. Krail has lost his employment, sustained serious damage to his career, lost his entire investment in iXOTIC, and is theoretically exposed to millions of dollars of liability pursuant to the agreements detailed heretofore in which he guaranteed the obligations and liabilities of iXOTIC.

**The Final Standoff**

373.    On September 22, 2009, iXOTIC on behalf of itself, Mr. Krail and AMBROSIUS notified the Defendants, Bernard, and, as best as iXOTIC could, AIGL, Chevalerie, TWB, TWPI, Eurofunds and I.E.S. Inc. that they were in material breach of their agreements with iXOTIC and Krail, that there had been material misrepresentations from the beginning justifying rescission of all the agreements, and that iXOTIC and AMBROSIUS demanded return of all payments made and iXOTIC's share certificates within forty-eight hours.

374.    Defendants have not returned either any money or any of the iXOTIC share certificates.

375.    One or more of the Defendants remains in possession or control of iXOTIC's share certificates.

376.    Kammer has in response to iXOTIC's demand not only denied any wrongdoing or any knowledge of the others' wrongdoing but had the nerve to invoke the release in favor of him and ABCShares and to remind iXOTIC of its liability to them for the success fee.

**The Perpetrators' Continuity and Connections**

377.    As evidenced by the Isle of Man and Lakeview Hotel cases detailed above, and the connection with both the domain names for Deutsche Capital Holding and AIGL, the group of Kammer, Templeton, ABCShares and Leite have been associated together and engaged in multiple similar schemes since at least 2004.  The use by Toruno of the same business name as

72

that of a corporation founded by Leite in Nevada and Toruno's own written confession that he had done "a few jobs [*sic*] for ABC like Due diligence for a three [*sic*] client and a few other things" show that he was also involved in multiple schemes with them over a period of time.

378.    The group whose apparent chief was Sampo had all the Chevalerie documents when they first meet with Plaintiffs, which could have only come from Kammer, and internet diagnostics show that the Couterier identity was transferred from Kammer to Panama.  Kammer specifically mentioned his business connections in Panama to Plaintiffs, and Sampo and colleague Alves de Melo are both Brazilian, as is Leite.

379.    Mario Sampo and the Universal Financial Group continue to engage in similar schemes to this day, having recently entered into transactions with two legitimate Brazilian entities that require the escrow of significant sums of money in bank accounts in the U.S.A. in the name of two New York business entities formed in 2011 by the same attorney who formed Eurofunds Administrative LLC.  In addition, Ricardo Anta was also involved in these two transactions and the name Dominic Bradley was used in e-mails, both consistent with the Winthrop scheme that bilked Plaintiff.  The legitimate parties were supposed to have received even larger sums of money this past November 2011, but they are still waiting, having been presented with a lengthening list of excuses for the delay.

380.    That same New York attorney who formed Defendant Eurofunds also recently formed another entity using the initials A.I.G. as part of its name, consistent with the longtime practice of the Kammer Group of using such entities, implicitly part of the best known insurance conglomerate in the world, as purported insurance entities to collect up front premiums for fraudulent but facially legitimate transaction aspects such as key man policies.

381.     The Chevalerie transaction was led by Kammer, a U.S. resident; Plaintiffs were led into the transaction by Cheney and Toruno, both U.S. residents and both representing U.S. corporations; most of the communications used to mislead Plaintiffs originated with Kammer at ABCShares, a Nevada corporation based in Florida; the majority of the perpetrators (Cheney, Toruno, Kammer, ABCShares and Templeton) were clearly U.S. domiciliaries, and Leite both had U.S. addresses and represented himself as operating from an AIGL office in Florida where the landlord confirmed it was indeed a tenant for a time; Plaintiffs were induced to send over a half million Euros to bank accounts in New York City and at the final stage were under pressure to send another almost one million euros to a New York Bank account.  The Chevalerie scheme was overwhelmingly a domestic operation.

382.     The Winthrop scheme was setup by Kammer, a U.S. resident; many of the key communications inducing Plaintiffs' payments originated from New York City telephone or telecopy numbers; every cent of the $4,776,179.49 monetary payments to the perpetrators was paid into New York City bank accounts held in the name of two business entities that were both, upon information and belief, formed and existing under the laws of one of the states of the U.S.A.; upon information and belief, the known Winthrop actors used U.S. attorneys to establish these entities and U.S. agents to open their bank accounts and to make these communications; they used the reputation of New York and the U.S.A. for financial substance, security and stability as a key part of their scheme to induce the payments; and they used New York telephone numbers and U.S. wires to make many of their communications and agreements providing for New York law to govern and New York courts to have jurisdiction along with domain names registered in the U.S.A. to induce the payments.  The Winthrop scheme was a substantially domestic operation.

74

383.   As a result, the overall victimization of Plaintiffs when viewed as a whole was a largely domestic operation.

384.   Upon information – including:  the neatly orchestrated hand-off chain from (1) Cheney to (2) Toruno, ABCShares, Kammer, Templeton and Leite, and from these to (3) Sampo, UF Group, Anta, Alves de Melo, Eurofunds and I.E.S. and their U.S. agents; the explicit fee sharing arrangements among them; the knowledge of Sampo and colleagues in Panama of the Chevalerie and AIGL transactions and the use by Sampo of the Chevalerie transaction documents and details, including the funds supposedly in AIGL's hands, for the Winthrop transaction; the web of connections among Defendants heretofore detailed through corporations, domain names, websites and in Florida, Panama and Brazil; and the common, recurring patterns in their wrongdoings – and belief, all the Defendants were knowingly engaged in a single, years long extensive conspiracy with the ongoing purpose of defrauding Plaintiffs and others and have shared among themselves the approximately $9 million in payments by AMBROSIUS on behalf of iXOTIC.

## First Claim:  Civil RICO -- Conduct of an Enterprise
### (Against All Defendants)

385.   Plaintiffs here adopt by reference all preceding allegations.

386.   Upon information and belief, as heretofore detailed, the Defendants, each of them of jointly, have voluntarily, intentionally, knowingly and willfully devised, conducted and participated in a scheme to defraud the Plaintiffs out of money by false pretenses.

387.   Upon information and belief, they did so with the intent to defraud Plaintiffs.

388.   It was reasonably foreseeable in so doing that interstate/international wire communications would be used to further Defendants' scheme.

389. Interstate/international wire communications were in fact used to further the scheme, including e-mails, telecopies, telephone and money transfers.

390. On more than one occasion, one or more of Defendants wrongfully transmitted in foreign commerce, with intent to extort money, a threat to injure the property of Plaintiffs, namely, to cause the forfeiture of the opportunity for financing sought by iXOTIC and/or of funds held in escrow at JPMorgan Chase in New York City and/or implicitly to trigger the personal liability of Mr. Krail, and, as a result of Plaintiffs' reasonable fear of economic loss, obtained money from Plaintiffs as a result of that threat.

391. Upon information and belief, Defendants thus committed multiple, related acts of wire fraud and/or extortion, all with the same purpose and same victims, namely, to obtain money from Plaintiffs, that amounted to continued unlawful, criminal activity over a substantial amount of time that is also a continuing threat to others, as evidenced by the reported past history of almost all the Defendants in similar fraudulent and other wrongful activity.

392. Upon information and belief, Defendants' scheme to defraud Plaintiffs constituted for Defendants a regular way of doing business.

393. Their scheme thus constituted a pattern of racketeering activity.

394. Upon information and belief, Defendants came together and associated and cooperated with each other for the purpose of defrauding Plaintiffs and others, by means of "advance fee" frauds and perhaps other financial frauds, beginning in or about 2004 through the present.

395. Upon information and belief, the Defendants thus acting together in an association in fact constituted an enterprise.

396. The activity of the Defendants' enterprise affected interstate and foreign commerce.

397. By virtue of the foregoing, Plaintiffs were directly injured in their business and their property, injury that would not have occurred but for Defendants' wrongdoing.

398. As a result of the foregoing and pursuant to 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for threefold their damages and the cost of this suit, including a reasonable attorney's fee.

### Second Claim: Civil RICO – Conspiracy

399. Plaintiffs here adopt by reference all preceding allegations.

400. Upon information and belief, each Defendant agreed to join the conspiracy to defraud Plaintiffs, agreed to act together including the commission of multiple acts of wire fraud and/or extortion, and knew that those acts were part of a pattern of racketeering activity.

401. As a result of the foregoing and pursuant to 18 U.S.C. § 1962(d), Defendants are liable to Plaintiffs for threefold their damages and the cost of this suit, including a reasonable attorney's fee.

### Third Claim: Civil RICO -- Conduct of an Enterprise
### (Against all Defendants except Eurofunds)

402. Plaintiffs here adopt by reference the allegations of paragraphs 1 through 384.

403. Upon information and belief, as heretofore detailed, the Defendants (except Eurofunds), each of them and jointly, have voluntarily, intentionally, knowingly and willfully devised, conducted and participated in a scheme to defraud the Plaintiffs out of money by false pretenses.

404. Upon information and belief, they did so with the intent to defraud Plaintiffs.

405.   It was reasonably foreseeable in so doing that interstate/international wire communications would be used to further the scheme.

406.   Interstate/international wire communications were in fact used to further the scheme, including e-mails, telecopies, telephone and money transfers.

407.   On more than one occasion, one or more of these Defendants wrongfully transmitted in foreign commerce, with intent to extort money, a threat to injure the property of Plaintiffs, namely, to cause the forfeiture of the opportunity for financing sought by iXOTIC and/or of funds held in escrow or other purposes and/or implicitly to trigger the personal liability of Mr. Krail, and, as a result of Plaintiffs' reasonable fear of economic loss, obtained money from Plaintiffs as a result of that threat.

408.   Upon information and belief, these Defendants thus committed multiple, related acts of wire fraud and/or extortion, all with the same purpose and same victims, namely, to obtain money from Plaintiffs, that amounted to continued unlawful, criminal activity over a substantial amount of time that is also a continuing threat to others, as evidenced by the reported past history of almost all the Defendants in similar fraudulent and other wrongful activity.

409.   Upon information and belief, the scheme to defraud Plaintiffs constituted for these Defendants a regular way of doing business.

410.   Their scheme thus constituted a pattern of racketeering activity.

411.   Upon information and belief, these Defendants came together and associated and cooperated with each other for the purpose of defrauding Plaintiffs and perhaps others, by means of "advance fee" frauds and perhaps other financial frauds, beginning in or about 2004 over a period of at least three years, that is, for at least the life of the fraud against Plaintiffs.

412.    Upon information and belief, these Defendants thus acting together in an association in fact constituted an enterprise.

413.    The activity of the enterprise affected interstate and foreign commerce.

414.    By virtue of the foregoing, Plaintiffs were directly injured in their business and their property, injury that would not have occurred but for these Defendants' wrongdoing.

415.    As a result of the foregoing and pursuant to 18 U.S.C. § 1962(c), these Defendants are liable to Plaintiffs for threefold their damages and the cost of this suit, including a reasonable attorney's fee.

### Fourth Claim:  Civil RICO – Conspiracy
### (Against all Defendant except Eurofunds)

416.    Plaintiffs here adopt by reference the allegations of paragraphs 1 through 384 and 402 through 414.

417.    Upon information and belief, each of these Defendants agreed to join the conspiracy to defraud Plaintiffs, agreed to act together including the commission of multiple acts of wire fraud and/or extortion, and knew that those acts were part of a pattern of racketeering activity.

418.    As a result of the foregoing and pursuant to 18 U.S.C. § 1962(d), these Defendants are liable to Plaintiffs for threefold their damages and the cost of this suit, including a reasonable attorney's fee.

### Fifth Claim:  Civil RICO -- Conduct of an Enterprise
### (Against Defendants Kammer and Eurofunds)

419.    Plaintiff's here adopt by reference the allegations of paragraph 1 through 384.

420.    Upon information and belief, as heretofore detailed, Kammer, Eurofunds and all the other Winthrop perpetrators, including their agents in the U.S.A., each of them and jointly,

have voluntarily, intentionally, knowingly and willfully devised, conducted and participated in a scheme to defraud the Plaintiffs out of money by false pretenses.

421. Upon information and belief, they did so with the intent to defraud Plaintiffs.

422. It was reasonably foreseeable in so doing that interstate/international wire communications would be used to further the scheme.

423. Interstate/international wire communications were in fact used to further the scheme, including e-mails, telecopies, telephone and money transfers.

424. On more than one occasion, one or more of Eurofunds and others of the Winthrop perpetrators wrongfully transmitted in foreign commerce, with intent to extort money, a threat to injure the property of Plaintiffs, namely, to cause the forfeiture of the opportunity for financing sought by iXOTIC and/or of funds held in escrow at JPMorgan Chase in New York City and/or implicitly to trigger the personal liability of Mr. Krail, and, as a result of Plaintiffs' reasonable fear of economic loss, obtained money from Plaintiffs as a result of that threat.

425. Upon information and belief, Eurofunds and others of the Winthrop perpetrators thus committed multiple, related acts of wire fraud and/or extortion, all with the same purpose and same victims, namely, to obtain money from Plaintiffs, that amounted to continued unlawful, criminal activity over a substantial amount of time that is also a continuing threat to others, as evidenced by the reported past history of almost all the Defendants in similar fraudulent and other wrongful activity.

426. Upon information and belief, their scheme to defraud Plaintiffs constituted for the perpetrators a regular way of doing business.

427. Their scheme thus constituted a pattern of racketeering activity.

428. Upon information and belief, Krammer, Eurofunds, and the other Winthrop perpetrators came together and associated and cooperated with each other for the purpose of defrauding Plaintiffs and others, by means of "advance fee" frauds and perhaps other financial frauds, over a period of several years, beginning at least in 2007 and through the present for the same continuing purpose.

429. Upon information and belief, Kammer, Eurofunds, and the other Winthrop perpetrators' thus acting together in an association in fact constituted an enterprise.

430. The activity of their enterprise affected interstate and foreign commerce.

431. By virtue of the foregoing, Plaintiffs were directly injured in their business and their property, injury that would not have occurred but for the wrongdoing of the Winthrop perpetrators, including Kammer and Eurofunds.

432. As a result of the foregoing and pursuant to 18 U.S.C. § 1962(c), Kammer and Eurofunds are liable to Plaintiffs for threefold their damages and the cost of this suit, including a reasonable attorney's fee.

### Sixth Claim:  Civil RICO – Conspiracy

433. Plaintiffs here adopt by reference the allegations of paragraphs 1 through 384 and 419 through 431.

434. Upon information and belief, Kammer, Eurofunds and the other Winthrop perpetrators each agreed to join the conspiracy to defraud Plaintiffs, agreed to act together including the commission of multiple acts of wire fraud and/or extortion, and knew that those acts were part of a pattern of racketeering activity.

435.    As a result of the foregoing and pursuant to 18 U.S.C. § 1962(d), Kammer and

Eurofunds are liable to Plaintiffs for threefold their damages and the cost of this suit, including a

reasonable attorney's fee.

### Seventh Claim:  Fraud in the Inducement and Rescission

436.    Plaintiffs here adopt by reference all preceding allegations.

437.    Upon information and belief, as heretofore detailed, Defendants misrepresented

material facts to Plaintiffs, including but not limited to:  the existence, legitimacy, capabilities,

substantiality and affiliations of the businesses Defendants represented or presented and even the

existence of many of the supposed individuals involved; Defendants' intent to facilitate or to

provide the financing and insurance sought by Plaintiffs; the facts of the money transfers by all

the entities other than AMBROSIUS; any due diligence supposedly conducted by any Defendant

concerning any entity other than Plaintiffs; the necessity of releases for transactions to proceed;

the intent, effect and legitimacy of the written agreements presented to Plaintiffs; the balances in

escrow and other bank accounts; *etc*.

438.    Upon information and belief, all those misrepresentations were false when made.

439.    Upon information and belief, each of the Defendants knew the falsity of all

misrepresentations.

440.    Upon information and belief, each of the Defendants made his false

representations with the intention of inducing iXOTIC and Mr. Krail to enter the various

agreements heretofore described and other reliance by Plaintiffs, including, of course, the

payments made by AMBROSIUS and the delivery to Defendants of iXOTIC's share certificates.

441.    Plaintiffs detrimentally relied on those misrepresentations.

442.     As of result of all this, Plaintiffs have sustained the monetary and other damages heretofore detailed.

443.     As a further result, all the agreements and releases are by law invalid and void *ab initio*, and Plaintiffs are entitled to a judgment rescinding all the agreements and releases and requiring return to them of all their payments and other property delivered to Defendants and payment by Defendants to Plaintiffs of their additional damages.

444.     Upon information and belief, Defendants conspired together to commit this fraudulent inducement.

445.     As a result, Defendants are jointly and severally liable to Plaintiffs.

446.     Upon information and belief, the fraud committed by Defendants, and by each of them, was gross, wanton, willful and morally culpable.

447.     As a result, Plaintiffs are entitled to punitive damages.

### Eighth Claim: Conversion

448.     Plaintiffs here adopt by reference all preceding allegations.

449.     Defendants' acceptance of payments by AMBROSIUS and the share certificates of iXOTIC was therefore without legitimate authorization.

450.     Defendants have exercised dominion and control over those funds and share certificates to the exclusion of Plaintiffs' rights to that property.

451.     Defendants have refused to return the property despite due demand by Plaintiffs.

452.     As a result, Plaintiffs are entitled to the return of that property, payment to them by Defendants of their additional damages, and punitive damages.

### Nineth Claim: Negligent Misrepresentation

453.     Plaintiffs here adopt by reference all preceding allegations.

454.    The relationship between Plaintiffs and Defendants, in particular, Plaintiffs willingness to pay significant amounts of money to them up front before receiving any financing, was one of confidence and trust.

455.    As a result, Defendants had a duty to speak with care as to the accuracy of their statements to Plaintiffs.

456.    Defendants' misrepresentations as detailed heretofore violated that duty.

457.    The information supplied by Defendants to Plaintiffs in those misrepresentations was known by the Defendants to be desired by the Plaintiffs for a serious purpose, namely, the loan transaction they sought.

458.    Plaintiffs intended to rely and to act on the information they sought and received from Defendants.

459.    Plaintiffs justifiably relied and acted on those misrepresentations and thereby incurred the damages heretofore detailed.

460.    Defendants are therefore liable to Plaintiffs for those damages.

**Tenth Claim: Unjust Enrichment**

461.    Plaintiffs here adopt by reference all preceding allegations.

462.    Defendants have benefitted by their wrongful actions.

463.    That benefit has been at Plaintiffs' great expense.

464.    Under the circumstances, equity and good conscience require restitution by Defendants to Plaintiffs.

465.    As a result, Plaintiffs are entitled to full restitution of their money and other property delivered to Defendants.

WHEREFORE, Plaintiffs demand judgment:

(a)     on the first, second, third, fourth, fifth and/or sixth claims, awarding Plaintiffs threefold their damages, plus interest as allowed by law, and the cost of this suit, including a reasonable attorney's fee;

(b)     on the seventh claim, rescinding all the agreements and releases between any one or more of the Plaintiffs and any one or more of the Defendants or Chevalerie, AIGL, TWB, TWPI, I.E.S. Inc, or Winthrop, ordering the return by Defendants of all payments of money by AMBROSIUS and of the iXOTIC share certificates delivered to Defendants, and awarding Plaintiffs their additional damages, plus interest as allowed by law, and punitive damages;

(c)     on the eighth claim, ordering the return of all payments of money by AMBROSIUS and of the iXOTIC share certificates delivered to Defendants, and awarding Plaintiffs their additional damages, plus interest as allowed by law, and punitive damages;

(d)     on the ninth claim, awarding Plaintiffs' their damages, plus interest as allowed by law, and punitive damages; and

(e)     on the tenth claim, awarding Plaintiffs' restitution of all money and other property delivered to Defendants, plus interest as allowed by law.

Dated: March 2, 2012

WUERSCH & GERING, LLP
Attorneys for Plaintiffs

By: _____
Gregory F. Hauser
100 Wall Street, 21st Floor
New York, NY 10005
(212) 509-4717